**FERDINAND DREXEL INVESTMENT CO., INC.; Vernon Alibert, et al.**

v.

**Victor F. ALIBERT, et al.**

Civ. A. No. 89–1319.

United States District Court, E.D. Pennsylvania.

Oct. 17, 1989.

Emmett Fitzpatrick, III, Philadelphia, Pa., for plaintiffs.

Jeffrey Cooper, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### INTRODUCTION

I have before me defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and Plaintiffs' Response thereto ("Response"). For the reasons given below, following oral argument on October 6, 1989, I will grant the Motion and enter judgment in favor of defendants and against plaintiffs.

A motion to dismiss under Rule 12(b)(6) cannot be granted "unless it appears beyond doubt" that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Summary judgment under Fed.R.Civ.P. 56 imposes different burdens upon the moving party. Summary judgment may only be granted if there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law. Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Before summary judgment may be granted it must be clear what the truth is, and any doubt as to the existence of a genuine issue of material fact will be resolved against the movant. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

On a summary judgment motion, the burden to demonstrate the absence of material fact issues is on the moving party regardless of which party would have the burden of persuasion at trial. *First National Bank of Pennsylvania v. Lincoln National Life Ins.,* 824 F.2d 277, 280 (3rd Cir. 1987). The moving party must clearly show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *on remand, Catrett v. Johns Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987), *cert. denied, Celotex Corp. v. Catrett*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). The evidence presented to the Court is always construed in favor of the party opposing the motion, and that party is given the benefit of all favorable inferences that can be drawn from it. *Addickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Facts asserted by the party opposing the motion, if supported by affidavit, are regarded as true. *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626 (2nd Cir.1972), Wright, Miller & Kane, Federal Practice and Procedure: Civil § 2727.

For the limited purpose of deciding defendants' Motion I will accept as true all of the allegations presented by plaintiffs in their Complaint and Response, and will accept as accurate and reliable the documentary evidence attached as exhibits thereto. I note for the record that the defendants dispute may of these allegations. Nevertheless, for the purpose of deciding this Motion, I find it unnecessary to consider the factual allegations and exhibits presented by defendants in their Motion and supporting memoranda. Since I am

considering allegations and evidence outside the pleadings, I will treat defendants' Motion as a Motion for Summary Judgment under Fed.R.Civ.P. 56(b).

## FACTUAL BACKGROUND

The factual background of this dispute, as alleged in the Complaint and Response and supported and amplified by the exhibits to them, is set forth in the following paragraphs.

In 1956, plaintiff Vernon Alibert, a physicist, started a business called Columbia Research Laboratories. The business primarily engaged in the design and manufacturing of accelerometers for the aerospace industry. Early on, Vernon Alibert brought his brother, defendant Victor Alibert, into the business as a partner. In 1958 they incorporated the business as Columbia Research Laboratories, Inc. ("Columbia I"), Victor and Vernon Alibert each owning 50% of the stock (Response, p. 3).

In 1959 Vernon and Victor decided to bring into the corporation as shareholders their sisters, Rose and Olive, and their mother, Ernestine. They also decided to give shareholder status to two of Columbia I's valued employees, Thomas Carey and George Harman. Accordingly, on September 1, 1959, all of the parties executed a Stockholders' Agreement which distributed ownership of Columbia I as follows:

| | |
|---|---|
| Vernon Alibert | 40 shares |
| Victor Alibert | 40 shares |
| Olive Alibert | 40 shares |
| Ernestine Alibert | 52 shares |
| Rose Alibert | 20 shares |
| Thomas Carey | 4 shares |
| George Harman | 4 shares |

Ernestine Alibert died in 1966 and bequeathed her shares in Columbia I to Vernon, Victor and Olive equally, leaving each of them with 57⅓ shares. The Stockholders Agreement remained in effect until October 2, 1979, when Vernon, Victor and Olive Alibert executed a new agreement cancelling all prior agreements (Response, p. 4).

Following the execution of the original Stockholder's Agreement two additional corporations were formed to take advantage of certain tax provisions. Alibert Properties, Inc. ("Alibert Properties I") became the owner of the headquarters building and Alibert Industries ("Alibert Industries I") performed manufacturing. Vernon, Victor and Olive each owned one third of the shares of these corporations. (Hereinafter Columbia I, Alibert Properties I and Alibert Industries I will be collectively called the "Old Companies") (Response, p. 4).

Over the next decades the business flourished. Vernon Alibert was the driving force of the Old Companies. Vernon was President and member of the Board of directors of Columbia I and Vice President and a member of the board of Directors of Alibert Properties I and Alibert Industries I (Response, pp. 4 & 5).

In August 1981, defendants Victor and Olive Alibert, without benefit of any shareholders' or Directors' votes, summarily and permanently prevented Vernon Alibert from performing any further duties and enjoying any further rights as an officer of the Old Companies, by barring him from the headquarters, instructing all of the respective corporate employees that they were to take no further orders from him, and threatening him and his family with physical harm if he tried to return (Complaint, ¶ 23, Response, p. 5).

Plaintiff Vernon Alibert was not formally removed from his position as president of Columbia I and Vice President of Alibert Properties I and Alibert Industries I until votes of the respective Boards of Directors at special meetings held on March 10, 1987, five and a half years later. Notice of these meetings was sent to counsel for plaintiff Vernon Alibert (Complaint, ¶ 24).

Plaintiff Vernon Alibert was paid his salary as President of Columbia I through calendar year 1986. For Example, in calendar year 1982, as revealed by Exhibit D to plaintiffs Response, plaintiff Vernon Alibert's compensation from Columbia I as a part time officer was $215,284. Defendant Victor Alibert, also part time, received compensation of $100,000 and defendant Olive Alibert, shown as full time, received compensation of $270,000. Shareholder/sister

Rose Alibert received $51,720 for "part time" services and shareholder/employee Thomas Carey received $61,294 for full time services. In that same year, the taxable income for Columbia I was $45,951. No dividend was paid (Response, p. 5 & Exhibit D).

After August, 1981, plaintiff Vernon Alibert never received notice from any of the Old Companies of annual Directors' or shareholders' meetings (Complaint, ¶ 45). (Notice to him regarding special Directors' and shareholders meetings directly involved in this litigation is discussed in connection with those meetings.)

During the period from August, 1981 until March 10, 1987 plaintiff Vernon Alibert remained ready, willing and able to resume his official duties, and in fact tried to do so (Complaint, ¶ 24).

Following his removal as an officer of the Old Companies on March 10, 1987, plaintiff Vernon Alibert repeatedly requested an accounting and distribution of his accrued pension benefits due from Columbia I, but defendants Victor and Olive Alibert, in their capacity as controlling agents of defendant Columbia I, refused to furnish that information (Complaint, ¶ 51).

At the time Vernon Alibert was barred from the headquarters of the Old companies, the stock certificates which evidenced his ownership interest in the Old Companies were all in the corporate safe in the headquarters building. Over a period of several years Vernon Alibert attempted unsuccessfully to obtain the certificates. Throughout the period defendants maintained that Vernon Alibert's stock certificates could not be located and refused to issue new ones. Finally, in October 1986, five years and two attorneys later, Vernon Alibert obtained replacement certificates (Response, p. 6).

During the same period, Vernon Alibert also tried to sell his interests in the Old Companies to defendants Victor and Olive Alibert. In August 1984 he offered to sell all of his shares in the Old Companies for $4,784,000.00. This offer was rejected by defendants. Later, in 1986, he offered to sell the shares for $3,000,000.00. This offer was also rejected and defendants made a counter-offer of $2,000,000.00, which was rejected by plaintiff Vernon Alibert (Complaint ¶¶ 26–30).

On August 31, 1986, plaintiff Vernon Alibert sold to plaintiff Ferdinand Drexel Investment Co. Inc. ("Ferdinand Drexel Co.") one share in each of the Old Companies. On August 20, 1987 plaintiff Vernon Alibert once again sold to plaintiff Ferdinand Drexel Co. one share in each of the Old Companies. In both sets of transactions written notice was sent to defendants, who refused to transfer the shares on the corporate books. Certificates for these shares have never been issued in the name of Ferdinand Drexel Co. (Complaint, ¶¶ 31–42, Response pp. 6–7).

Plaintiff Ferdinand Drexel Co. has never received notices of any annual or special shareholders' meetings nor has it received stock certificates from any of the Old Companies (Complaint, ¶ 46).

On July 20, 1988 plaintiff Vernon Alibert presented to counsel for defendants affidavits dated July 18, 1988 stating that he was the owner of 57⅓ shares of Columbia Research Laboratories, Inc, 44 shares of Alibert Industries, Inc. (actually there were 150 shares outstanding, of which plaintiff Vernon Alibert's one-third share equalled 50 shares) and 10 shares of Alibert Properties, Inc. Allowing for plaintiff Vernon Alibert's misunderstanding concerning the number of shares in Alibert Industries, Inc, these are the full number of shares of the Old Companies owned by plaintiff Vernon Alibert, without allowance for the transfers to plaintiff Ferdinand Drexel Co. (Response, Exhibit K).

In February, 1988, defendants Victor and Olive Alibert caused three new corporations called "Olvic Laboratories, Inc., Olvic Industries, Inc. and Olvic Properties, Inc." (hereinafter collectively referred to as the "New Companies") to be formed and registered with the Commonwealth of Pennsylvania. The New Companies had only token assets and were formed for the purpose of merging with Columbia I, Alibert Industries I and Alibert Properties I respectively. Defendants Victor and Olive Alibert

were the controlling Directors officers and majority shareholders of the New Companies. Plaintiff Vernon Alibert was not offered shares in the New Companies (Complaint, ¶¶ 53–55 and Exhibits F–K)[1].

Plaintiff Vernon Alibert remained a Director of each of the Old Companies until their corporate existence was terminated by merger into the respective New Companies (Complaint, ¶¶ 20–22, 44).

On March 11, 1988, defendants Victor and Olive Alibert, as controlling agents of defendant Old Companies, sent to plaintiff Vernon Alibert, by certified United States first class mail, notices of Directors meetings of the Old Companies to be held on March 25, 1988. The purpose of the Directors' meetings was to approve for submission to the shareholders a Plan and Agreement of Merger for each of the Old Companies into the respective New Companies. The envelope containing the notices was marked "refused" by the United States Postal Service on March 12, 1988 and returned to the sender. Consequently defendants were on notice that plaintiff Vernon Alibert never actually received those notices (Complaint, ¶ 59 and Exhibits F, G, H, Response, Exhibit N).

The Boards of Directors of each of the Old Companies met on March 25, 1988 and approved, for submission to the shareholders on April 12, 1988, a Plan and Agreement of Merger for merging each of the Old Companies into the respective New Companies (Complaint, ¶¶ 58, 62).[2]

On March 25, 1988 defendants Vernon and Olive Alibert, as controlling agents of defendant Old Companies, sent to plaintiff Vernon Alibert, by certified United States first class mail, notices of a special shareholders' meeting called to consider the merger of the Old Companies into the New Companies. The envelope containing the notices was marked "refused" by the Unit-

ed States Postal Service on March 28, 1988 and returned to the sender. Consequently defendants were on notice that plaintiff Vernon Alibert never actually received those notices (Complaint, ¶¶ 60, 61, 63–67 and Exhibits I, J, K, Response, Exhibit N).

On April 12, 1988 defendants Victor and Olive Alibert, as controlling agents of the Old Companies, caused the shareholders meetings to be held as scheduled and voted their shares, which constituted the majority, in favor of the merger of each of the Old Companies into the respective New Companies. Upon merger, the name of each of the New Companies was changed to that of the Old Company which was merged into it. (Hereinafter individual reference to the New Companies will be to "Columbia II", "Alibert Properties II" and "Alibert Industries II") (Complaint, ¶ 68).

Under the mergers, holders of shares in the New Companies, who in fact were all of the holders of shares in the Old Companies except plaintiffs, exchanged their shares in the Old Companies for equivalent shares in the New Companies. The mergers had the purpose and effect of eliminating plaintiff Vernon Alibert as a shareholder and Director of the Old Companies, which ceased their independent corporate existence. The mergers had the further effect of forcing plaintiff Vernon Alibert to receive the following compensation for his shares in the Old Companies: for his $57\frac{1}{3}$ shares of Columbia I, $29,652.00 a share or $1,700,048.00; for his 10 shares in Alibert Properties, $5000.00 a share or $50,000.00; and for his 50 shares of Alibert Industries I (not 44 shares as he claims), $5000.00 a share or $250,000.00. These amounts would be paid in four equal annual payments, with interest on the unpaid balance at 8% per annum. These payments would, of course, be subject to the interest of

---

1. The Complaint, ¶¶ 53–55, as well a certain subsequent paragraphs, speak of "Olvic" or "Columbia II" as though there were only one successor corporation. In fact there was one New Company for each Old Company. *See* Exhibits F–K of the Complaint.

2. The Complaint, ¶ 58, speaks of Directors' meetings on March 25, 19*87*. Context indicates that this should read March 25, 19*88*. The Complaint, ¶ 62 speaks of shareholders' meetings scheduled for March 25, 1988. That was the date of the Directors' meetings. The correct date for the shareholders meetings is April 12, 1988. (Complaint, Exhibits I, J, K)

plaintiff Ferdinand Drexel Co. (Complaint, ¶¶ 76, 78 and Exhibits F–N).[3]

The mergers purportedly became effective on or about May 4, 1988 under the laws of the Commonwealth of Pennsylvania (Complaint ¶ 69 and Exhibits L, M, N).

There is no allegation by the plaintiffs that at any time, between the mailing on March 11, 1988 of the notices of the special meetings of the Boards of Directors of the Old Companies scheduled for March 25, 1988 and the effective date of the merger, May 4, 1988, Vernon Alibert filed a written objection to the terms of the merger. Provision for such written objection is found in Section 5(c) of the Plan and Agreement of Merger of each of the Old Companies, sent with the notices of the Directors' meetings and the shareholders' meetings, and in Section 515 B of the Pennsylvania Business Corporation Law, 15 P.S. § 1515 B. As required by Section 902 B of the Pennsylvania Business Corporation Law, 15 P.S. 1902 B, copies of Sections 515 and 908 of that law, 15 P.S. § 1515 and § 1908, were attached to the notices of the shareholders' meetings (Complaint, Exhibits F–K).

On or about June 27, 1989, defendants Victor and Olive Alibert, as controlling agents of the defendant Old Companies, sent plaintiff Vernon Alibert notices through the United states Postal Service that his shares of stock had been exchanged for a specified amount of cash, which was to be paid in installments. On July 6, 1988 the envelope enclosing these notices was marked "refused" by the Postal Service (Complaint ¶ 81, Exhibit N).

Defendants Victor and Olive Alibert, in their positions as controlling agents of defendant Old Companies, gave plaintiff no information regarding how the values attributed to his share of the Old Companies were computed under the terms of the merger (Complaint, ¶ 82).

During and after the merger, defendants Victor and Olive Alibert were planning and negotiating to sell the New Companies after the merger. These plans or negotiations were never disclosed to plaintiff Vernon Alibert (Complaint, ¶¶ 73, 74).

The defendants never offered to plaintiffs Vernon Alibert and Ferdinand Drexel Co. any reason for the mergers. In particular they did not reveal that the sole purpose of the mergers was to eliminate plaintiff Vernon Alibert as a shareholder (Complaint, ¶ 75, Response, p. 17).

At the time of approval of the merger by the majority shareholders of the Old Companies, each of the Old Companies, as well as defendants Victor and Olive Alibert, had actual notice that plaintiff Vernon Alibert objected to the terms of the merger, because he had previously and repeatedly expressed to them, through counsel, his desire to resume active participation in the corporations, and because he had previously rejected the offer of defendants Victor and Olive Alibert to purchase his shares for $2,000,000.00, virtually the same amount which he was forced to accept under the terms of the merger (Complaint, ¶ 80).

Defendants Victor and Olive Alibert, in their positions as controlling agents of defendant Old Companies altered the books and records of the Old Companies to support the false values which were attributed to plaintiff Vernon Alibert's shares under the terms of the mergers.[4] (Complaint, ¶ 79)

At the time of the merger, under any accepted method of accounting, the true

---

**3.** The statement in footnote 4, page 8 of Plaintiff's Response: "The Merger documents unquestionably failed to provide for Ferdinand Drexel [Co.'s] shares of the corporations", and the allegations of paragraphs 77 and 84 of the Complaint to the same effect, are, simply, not true. The Plan and Agreement of Merger for each of the Old Companies provided for the per share prices set forth above. Multiplication of those amounts by the number of shares in each of the Old Companies held by plaintiff Vernon Alibert before his attempted transfer of two shares in each of them to Ferdinand Drexel Co., yields the totals set forth in the post merger notices, as also set forth above. A better statement would be that the Merger documents failed to treat any shares as having been transferred to Ferdinand Drexel Co.

**4.** There is no allegation that the allegedly altered books have ever been communicated to plaintiffs, particularly by mail or wire, or that plaintiffs relied on them to their detriment.

value of plaintiff Vernon Alibert's shares in the Old Companies far exceeded the values attributed to them by the defendants. In addition, there was due and owing to plaintiff more than $329,000.00 in retained earnings, which defendants Victor and Olive Alibert, as controlling agents of defendant Columbia I, refused to account for or release despite plaintiff Vernon Alibert's repeated requests (Complaint, ¶¶ 83, 85).

## DISCUSSION

### GENERAL INTRODUCTION

■ Plaintiffs have cited a long list of complaints against the defendants. Some of them may state a cause of action under various Pennsylvania laws. However, stripped of pejorative language and collateral issues under Pennsylvania law, plaintiff Vernon Alibert's federal causes of action are based on his contention that by action of family members, who were the majority shareholders, he was fraudulently divested of his ownership interest in the Old Companies. But fraud is a narrowly defined cause of action and, pursuant to Fed.R.Civ.P. 9(b), the circumstances constituting fraud must be stated with particularity. Not every civil or business wrong sounds in fraud.

Plaintiffs' federal causes of action are based on allegations of securities fraud under the Securities Act of 1934, 15 U.S.C. § 78j and the regulations promulgated thereunder, 17 C.F.R. § 240.10b–5; and under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 with predicate acts of securities fraud and of mail fraud under 18 U.S.C. § 1341.

### FERDINAND DREXEL INVESTMENT CO., INC.

■ The situation of plaintiff Ferdinand Drexel Co. is somewhat different from the situation of plaintiff Vernon Alibert. Ferdinand Drexel Co. never had a notice to rely on because the shares of the old Companies conveyed to Ferdinand Drexel Co. were not transferred on the books of the Old Companies, a fact known to both plaintiff Vernon Alibert and plaintiff Ferdinand

Drexel Co. Since the federal causes of action, securities fraud and RICO, are based on the "sale" to the New Companies of plaintiff Vernon Alibert's share in the Old Companies, and since plaintiff Ferdinand Drexel Co. was not the registered owner of those shares, its rights relating to those shares must be vindicated through the registered owner, Vernon Alibert. If plaintiff Vernon Alibert's federal rights fail, so do the federal rights of plaintiff Ferdinand Drexel Co. Plaintiff Ferdinand Drexel Co. may well have direct causes of action under Pennsylvania law, but not under the federal claims alleged here.

I note that in this entire litigation there has been no independent action by or on behalf of Ferdinand Drexel Co. No person claiming to be an officer of Ferdinand Drexel Co. has signed a document or prepared an affidavit. Although the value of the shares conveyed to plaintiff Ferdinand Drexel Co. is, at the *defendants'* valuation, $79,304, a not inconsiderable amount, the role of plaintiff Ferdinand Drexel Co. has been entirely passive.

### DERIVATIVE CLAIMS

■ Plaintiffs also raise a derivative cause of action on behalf of the Old Companies. This cause is set forth in paragraph 87 of the Complaint, as follows:

"As a direct and proximate result of the execution of the illegal scheme of Defendants Victor and Olive Alibert which is described above, Plaintiffs Columbia I, Alibert Industries [I] and Alibert Properties [I] were caused to lose their corporate existence and to convert their shares into shares of the surviving corporation[s] at less than their true market value."

Plaintiffs did not argue this point and have cited no authority for the proposition that a corporation has an inherent constitutional or common law "right to life", or that a change in corporate ownership arising from a merger, where the surviving corporation has the same assets and liabilities as the predecessor corporation, states a cause of action of the predecessor corporation.

■ With regard to the second part of the derivative claim pertaining to share val-

ue, the New Companies are the direct successors in interest to the Old Companies.[5] The only shares for which there has been a claim of inadequate consideration were the shares held by the plaintiffs. Plaintiffs claim that the New Companies, the successors in interest to the Old Companies, paid too low a price in a buy-back of the shares of their predecessor Old Companies. The shares which were converted into shares of the New Companies would have had their value increased rather than decreased by the New Companies paying too low a price in such a transaction. Plaintiffs cite no authority for the proposition that a transaction which enhanced the value of the New Companies shares in this type of merger states a cause of action of the Old Companies or the New Companies, their successors in interest. Unless there is a cause of action of the Old Companies or the New Companies, there can be no shareholder's derivative action.

## INTRODUCTION TO SECURITIES FRAUD AND RICO

Having determined that there is no direct federal cause of action of plaintiff Ferdinand Drexel Co., and that the plaintiff Old Companies have no derivative federal cause of action, I must determine whether the Complaint states federal causes of action in Securities Fraud or under RICO on behalf of plaintiff Vernon Alibert. For the reasons discussed below, I find that plaintiffs have not stated a federal cause of action in securities fraud or under RICO. Consequently, even though plaintiffs may have valid causes of action under Pennsylvania law, there is no federal cause of action and no jurisdiction in this court.

5. The New Companies have the same shareholders of record as the Old Companies, with the exception of plaintiff Vernon Alibert. Columbia II has 114⅔ shares of class A stock outstanding, representing the 114⅔ shares in Columbia I held by defendants Olive and Victor Alibert. It has 24 shares of non-voting Class B stock outstanding, representing the 20 shares of sister Rose Alibert and the 4 shares of employee Thomas Carey. There is no indication in the record of the disposition of the interest of em-

## SECURITIES FRAUD

The requirements for a cause of action in securities fraud have in been described as follows in this circuit:

"In order to state a claim under § 10(b) and Rule 10b–5, a plaintiff must plead the following elements:

1) a false representation of 2) a material 3) fact: 4) defendant's knowledge of its falsity and his intention that plaintiff rely on it [although recklessness, as opposed to actual intent, will suffice]: 5) the plaintiff's reasonable reliance thereon; and 6) his resultant loss.

*Peil v. Speiser,* 806 F.2d 1154, 1160 & n. 9 (3rd Cir.1986) (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3rd Cir.), *cert. denied sub nom. Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); 3 Loss, *Securities Regulation* 1431 (1961)). The District Court dismissed the complaint in this case because it found Zlotnick's amended complaint did not meet this requirement of pleading reliance. This is the sole issue on appeal."

*Zlotnick v. TIE Communications,* 836 F.2d 818, 821 (3rd Cir.1988).

## 1–3. FALSE REPRESENTATION OF MATERIAL FACT

■ To begin with, the notices, and the Plan and Agreement of Merger included with each of them, mailed to plaintiff (Exhibits F–J to the Complaint) do not constitute a misrepresentation of material facts (elements 1–3). The notices, sent in compliance with 15 P.S. § 1902, tell the plaintiff what the majority shareholders plan to do, namely to consummate a forced buy-out of his interest in the Old Companies at a certain price. They tell him what he can do to

ployee George Harman. I note that there is no reference to George Harmon's interest in the 1982 corporate tax return, Exhibit D to plaintiffs' Response, so presumably his interest had been previously extinguished. Alibert Industries II has 100 shares outstanding, representing the 100 share interest of defendants Olive and Victor Alibert in Alibert Industries I. Alibert Properties II has 20 shares outstanding, representing the 20 shares of defendants Olive and Victor Alibert in Alibert Properties I.

protect himself, namely, to exercise his rights under Section 515 of the Pennsylvania Business Corporation Law, 15 P.S. § 1515. Moreover, as it turns out, the defendants did exactly what they said they were going to do. Not having received a written objection by plaintiff, they held the meetings and consummated the mergers, as stated in the notices, and arranged for payment of the stated price for plaintiff's shares.

Since the plaintiffs' securities fraud cause of action fails on a more fundamental basis, namely the absence of any allegation of detrimental action by the plaintiffs in reliance on the alleged misrepresentation, I will defer fuller discussion of why the notices are not fraudulent until my discussion of the RICO allegation. That discussion deals, *inter alia*, with the allegations of omission of material facts.

## 4(a). KNOWLEDGE OF FALSITY

Since I have concluded that the notices and Plan and Agreement of Merger were not false statements, the first part of the fourth element, knowledge by the defendants that their representations were false, also fails.

## 4(b). INTENTION FOR RELIANCE

Regarding the second part of the fourth element, intention that the plaintiff rely on the representation, clearly the defendants contemplated that the plaintiff would act on the notices. As with elements 1–3, this element is more fully discussed in my discussion of the RICO allegation.

## 5. ACTION IN RELIANCE

 The most fundamental reason why plaintiffs' federal cause of action for securities fraud fails is their failure to allege the fifth element, plaintiff Vernon Alibert's reasonable reliance on the alleged misstatements. Plaintiffs nowhere allege that plaintiff Vernon Alibert took any detrimental action in reliance on the alleged misrepresentations. Instead they argue

that where, as here, the misrepresentations consist of a failure to disclose material facts, reliance is not a necessary element of securities fraud. Plaintiffs' argument is based on *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Assuming, *arguendo*, that there had been the failure to disclose a material fact, plaintiffs are still wrong in their analysis. The operative sentence in *Affiliated Ute* is:

> "Under the circumstance of this case, involving primarily a failure to disclose, *positive proof of reliance* is not necessary. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." (emphasis supplied)

*Id.*, 406 U.S. at 153–154, 92 S.Ct. at 1472. In a more recent case, *Basic, Incorporated v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), commenting on *Affiliated Ute, supra*, the Court said:

> "*We agree that reliance is an element of a Rule 10b–5 cause of action. [citation omitted] Reliance provides the requisite causal connection between a defendant's misrepresentations and plaintiff's injury* [6] [citation omitted] There is however more than one way to demonstrate the causal connection. Indeed, we previously have dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendants' wrongful conduct had been established. See *Affiliated Ute Citizens v. United States*, 406 U.S., at 153–154, 92 S.Ct. at 1472." (emphasis supplied)

*Basic, Incorporated, supra*, 485 U.S. at 243, 108 S.Ct. at 989. The *Basic, Incorporated* Court went on to enunciate the "fraud on the market doctrine", which dispenses with the requirement of proof of individual reliance in certain cases involving publicly traded shares.

---

**6.** In his reading and discussion of this quotation in oral argument, plaintiff's counsel omitted the underlined portion.

In other words, as demonstrated by *Affiliated Ute* and *Basic, Incorporated,* reliance remains an essential element of a cause of action for securities fraud, but in certain circumstances individual reliance may be presumed and need not be proved. Significantly, in all of the cases where reliance has been presumed, there has been a causal nexus between a misrepresentation by the defendant and an action by the plaintiff which caused his injury. As indicated earlier, in my discussion of the elements of a claim under § 10(b) and Rule 10b–5, the Third Circuit has recently enunciated the requirement for reliance in *Zlotnick, supra,* 836 F.2d at 821.

## 6. NEXUS

 Which brings me to the sixth element, plaintiff's resultant loss, *i.e.,* causal connection. In this case plaintiff Vernon Alibert does not allege that his failure to act to protect his interests and those of Ferdinand Drexel Co. was caused by any misrepresentation by the defendants. In fact, plaintiffs have alleged (Complaint ¶¶ 61 & 67) that plaintiff Vernon Alibert never received the notices, rendering a causal nexus between the alleged misrepresentations and plaintiffs' harm impossible.

## MANIPULATIVE BEHAVIOR AND BREACH OF FIDUCIARY DUTY

 Plaintiffs imply that it was fraudulent for defendants to send the notices knowing that plaintiff Vernon Alibert would not open them or respond to them, that sending notices which they knew would not be read was, in effect, a failure to give notice of the merger and that it was fraudulent for them to consummate the mergers as contemplated by the notices when they knew that neither plaintiff Vernon Alibert or plaintiff Ferdinand Drexel Co. had received the notices. Plaintiffs also contend that defendants pattern of behavior was manipulative and a breach of fiduciary duty within the meaning of the federal securities laws. Whatever the consequences of these allegations and contentions might be under Pennsylvania law, they do not state a federal cause of action in securities fraud.

The Supreme Court dealt with the question of what constitutes manipulative behavior under the federal securities laws, and the application of the federal securities laws to breach of fiduciary duty, in *Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Regarding "manipulation" in the context of securities markets, the court said:

"'Manipulation' is 'virtually a term of art when used in connection with securities markets.' [citation omitted] The term generally refers to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. Section 10(b)'s general prohibition of practices deemed by the SEC to be 'manipulative'—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act, 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor ...' [citation omitted] Indeed, nondisclosure is usually essential to the success of a manipulative scheme. [citation omitted] No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the compliant is that shareholders were treated unfairly by a fiduciary."

*Sante Fe, supra,* 430 U.S. at 476, 97 S.Ct. at 1302.

Plaintiffs cite *Polin v. Conductron Corp.,* 552 F.2d 797 (8th Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977) for the proposition that:

"The cases passing upon the validity of mergers having the effect of eliminating the private shareholders agree on one basic proposition, namely, that the presence or absence of a legitimate business purpose for the merger is of critical im-

portance in appraising the bona fides of the transaction."

*Polin, supra,* 552 F.2d at 815. That holding depends on the following holding in *Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283 (2nd Cir.1976):

"We hold that a complaint alleges a claim under Rule 10b–5 when it charges, in connection with a Delaware short-form merger, that the majority has committed a breach of its fiduciary duty to deal fairly with minority shareholders by effecting the merger without any justifiable business purpose."

*Green, supra,* 533 F.2d at 1291. In reversing *Green* on that point, the Supreme Court said:

"But the cases do not support the proposition, adopted by the Court of Appeals below, and urged by respondents here, that a breach of fiduciary duty, without any deception, misrepresentation, or nondisclosure, violates the statute [§ 10(b) ] and the Rule [10b–5]."

*Sante Fe, supra,* 430 U.S. at 476, 97 S.Ct. at 1302. The Sante Fe Court, in declining to extend the reach of the federal securities law to breaches of fiduciary duty, went on to say:

"Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden. As the Court stated in *Cort v. Ash, supra* [422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) ]: 'Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporations.' 422 U.S. at 84, 95 S.Ct, at 2091 (emphasis added)."

*Sante Fe,* supra, 430 U.S. at 479, 97 S.Ct. at 1304.

To place this matter in a different perspective, the Pennsylvania Supreme Court, in commenting on a force-out merger of this kind, albeit one involving publicly traded shares, said:

"We wish to emphasize that today's decision does not condone the manner in which appellants and other minority shareholders were deprived of their equitable interest in J & L. We are not unmindful of the grave unfairness and fraud frequently present in mergers of this type, especially where there is a 'cash-out' of the minority shareholders. [citation omitted] *Our concern, however, does not change the view that appellants' post merger remedies were limited to the appraisal of the fair value of their stock.* Thus we must agree with the Superior Court's conclusion that the hearing court did not possess the power to determine the substantive fairness of the transaction." (Emphasis supplied)

*In re Jones & Laughlin Steel Corp.,* 488 Pa. 524, 533–34, 412 A.2d 1099, 1104 (1980). In so holding, the Court declined to provide an extraordinary remedy where a statutory remedy, Section 515 of the Pennsylvania Business Corporation Law, had been provided.

To summarize, plaintiff Vernon Alibert was given all of the information he needed to make an informed decision regarding whether to take legal action to protect his position in connection with the merger of the Old Companies into the New Companies. Plaintiffs did not allege that they acted justifiably to their detriment in reliance on any misstatement or failure to disclose by the defendants. Further, the none-receipt of the merger notices rendered any detrimental reliance impossible. Consequently plaintiffs have not alleged the necessary requisites for a federal cause of action in securities fraud.

RICO

Plaintiffs' allegations concerning RICO is an attempt to bring the same "scheme" that was alleged under the federal securities laws under the RICO statute.

The RICO claim is set forth in paragraphs 89 and 91 of the Complaint as follows:

"89. The multiple illegal uses of the United States Postal Service by Defendants Victor and Olive Alibert described above constitute violations of the federal mail fraud statute; 18 U.S.C. § 1341.

91. In committing the multiple illegal acts described above, and in planning, conspiring to execute, agreeing to execute, and executing the illegal scheme described above, Defendants Victor and Olive Alibert conducted an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968."

RICO covers both criminal offenses and civil causes of action. The civil cause of action is based on 18 U.S.C. § 1964(c):

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of suit, including reasonable attorney's fee."

The claim in the Complaint does not specify the section of RICO on which it relies, but it appears to rely on 18 U.S.C. 1962(c), which provides:

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Racketeering Activity is defined in 18 U.S.C. § 1961, and as relevant to plaintiffs' claim includes securities fraud and mail fraud. Since I have already decided that there is no federal cause of action for securities fraud, I will make my analysis of the RICO claim in the context of the allegation of mail fraud.

■■■ Mail fraud is a criminal offense, not a civil cause of action. It is one of the predicate acts listed in the RICO statute, 18 U.S.C. § 1961(1). Mail fraud is defined in 18 U.S.C. § 1341:

"§ 1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . ."

■■■ Therefore, in the context of mail fraud as a predicate act, in order to state a claim sufficient to survive defendants Motion for Summary Judgment, plaintiffs' RICO claim must allege in the Complaint the Response and supporting documents, the following:

1. EMPLOYED OR ASSOCIATED—That defendants are persons employed by or associated with any enterprise engaged in or the activities of which affect interstate or foreign commerce.

2. PARTICIPATING—Who conduct or participate directly or indirectly, in the conduct of such enterprises affairs by;

3. MAILING—For the purpose of obtaining money or property by means of false or fraudulent pretenses, representations or promises, or attempting to do so:

(a) placing in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service;

(b) On at least two occasions;

(c) over a substantial period of time and;

(d) forming a pattern of actions related to such purpose.

4. NEXUS—Plaintiffs have been injured in their business or property as the result of such fraudulent scheme.

I will test plaintiffs' RICO claim based on the elements listed above.

## 1. EMPLOYED OR ASSOCIATED

Defendants are employed or associated with enterprises engaged in and affecting interstate commerce.

## 2. PARTICIPATING

Defendants participate directly in the conduct of the affairs of the enterprises.

## 3. MAILING—PURPOSE

This is the first contested issue. There is no question that the defendants intended to force plaintiff Vernon Alibert to take cash for his interest in the old Companies. The question is whether the intention was by "artifice to defraud or obtain money or property by means of false or fraudulent pretenses, representations or promises."

Defendants devised a forced buy-out, pursuant to section 902 of the Pennsylvania Business Corporation Law, 15 P.S. § 1902, of plaintiff's Vernon Alibert's interest in the Old Companies. This was to be accomplished by merging the Old Companies into shell companies owned by the same stockholders as the Old Companies, except for plaintiff Vernon Alibert (and, as its interests may appear, Ferdinand Drexel Co.). Under the terms of the Plan and Agreement of Merger, plaintiff Vernon Alibert would have the choice of accepting a stated amount of money for his shares, or to bring an action pursuant to section 515 of the Pennsylvania Business Corporation Law, 15 P.S. § 1515 to determine the fair value of his shares.

Since plaintiff Vernon Alibert was both a director and a shareholder of the Old Companies, two notices were required to be sent to him, notifying him of the Directors' meetings and the shareholders meetings at which the mergers would be approved. Both of these were mailed to plaintiff Vernon Alibert, and refused by him.

Since the defendants followed the procedures set forth in 15 P.S. § 1902 for a statutory merger involving minority dissenting shareholders, the question presented is whether, as a matter of law, it can be said that the defendants intended that plaintiff Vernon Alibert would fraudulently be induced to accept the defendants' unfairly low price for his shares.

Plaintiffs argue, in their Response, that an "illegal scheme" constituting mail fraud is described in paragraphs 52–88 (actually 52–89) of the Complaint. Those paragraphs describe the forced buy-out discussed above, and include allegations that there were nine mailings (actually three mailings, containing nine documents) in furtherance of the scheme. These mailings are the notices of the Directors and shareholders meetings and the notices to plaintiff Vernon Alibert that he has been bought out. (Complaint, exhibits F–N, Response Exhibit N).

██ An essential element of mail fraud is intent to defraud. A classic definition of fraud under Pennsylvania common law requires:

1. a misrepresentation,
2. a fraudulent utterance thereof,
3. an intention by the maker that a recipient will thereby be induced to act,
4. justifiable reliance by the recipient upon the misrepresentation, and
5. damage to the recipient as the proximate result.

*Neuman v. Corn Exchange National Bank & Trust Co.*, 356 Pa. 442, 450, 51 A.2d 759 (1947). "The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity." *Id.*, 356 Pa. at 451, 51 A.2d at 759.

██ Since the notices told plaintiff Vernon Alibert what the defendants intended to do, and when they intended to do it, as well as what he needed to do to protect himself in the event that he disagreed with the terms of the merger, and considering that the defendants in fact did exactly what they said they would do, the notices are not fraudulent on their face.

Plaintiffs argue that the notices were fraudulent in that there were material omissions from the merger notices. These omissions were: failure to state the method of calculating the value of the plaintiffs' interest in the Old Companies (including an allegation that the books had been altered to reflect the defendants' improperly low valuation); failure to disclose that the defendants had been negotiating the sale of the New Companies following merger; and failure to disclose that the sole purpose of the mergers was to eliminate plaintiff Ver-

non Alibert as a shareholder.[7] There is a further allegation that the defendants, by sending notices which they knew would not be read by plaintiff Vernon Alibert, in effect omitted the material fact that the merger would take place. As discussed later in this opinion, the actual effect of plaintiff Vernon Alibert's failure to accept delivery of the several notices was to make reliance and causal nexus impossible.

Since the alleged misrepresentations involve the sale of securities, the best analysis of materiality can be found in federal securities law, and in fact, plaintiffs place reliance on that law. In analyzing the materiality of the allegedly withheld information, plaintiff relies on the test found in *Basic, Incorporated v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988):

> "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."

*Id.*, 485 U.S. at 231, 108 S.Ct. at 983, 99 L.Ed.2d at 208–209. The *Basic, Inc.* court goes on to say:

> "The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b–5's reliance requirement must encompass these differences.
>
> 'In face to face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market,

the market is interposed between seller and buyer ...' "

*Basic, Inc., supra,* 485 U.S. at 241–244, 108 S.Ct. at 989–990.

■ What plaintiffs have failed to recognize in their analysis of the materiality of defendants' alleged failure to disclose certain facts is that materiality, like reliance, cannot be divorced from the context of the individuals and transactions involved. This is not a case like *Affiliated Ute, supra,* in which a substantial number of unsophisticated and impoverished reservation mixed-blood Utes were divested of their interest in tribal property by what can best be described as "city slickers" with an egregious conflict of interest. Nor is it a case like *Basic, Inc., supra,* involving members of the investing public and publicly traded shares. In this case there is no market interposed between buyers and sellers. Instead, this action involves a transaction between family members who had been involved with the companies in question for thirty years, and who had been involved in a dispute with each other over its ownership and control for nearly seven years.

■ In evaluating the materiality of the undisclosed information, in the context of this litigation, I must consider how a reasonable investor, in the position of plaintiff Vernon Alibert, would have decided the choice presented to him by the notices and the attached Plan and Agreement of Merger, particularly paragraph 5 of the Plan and Agreement[8], as set forth in the mar-

---

7. In his concurring opinion in *Sante Fe, supra,* Justice Stevens noted: "The motivation for the merger is a matter of indifference to the minority shareholders because they retain no interest in the corporation after the merger is consummated." *Sante Fe, supra,* 430 U.S. at 481, 97 S.Ct. at 1305, note 2.

8. Paragraph 5 of the Plan and Agreement of Merger for Columbia I reads, in full, as set forth below. The Plans for the other Old Companies are essentially the same except for the specific provisions regarding class, number of shares and price.

> 5. *Shares of Constituent Corporations*
>
> (a) Each share of common stock of Olvic issued and outstanding on the effective date of the merger shall, by virtue of the merger and

without action on the part of the holder thereof, be, on the effective date of the merger, converted in the following manner:

(i) Each share of Class A Stock of Olvic shall be converted into one share of Class A Stock of the Surviving Corporation; and

(ii) Each share of Class B stock of Olvic shall be converted into one share of Class B stock of the Surviving Corporation.

(b) Each share of common stock of Columbia issued and outstanding on the effective date of the merger shall, by virtue of the merger, be converted in the following manner, and all rights in respect of such share, and all certificates evidencing such shares, shall thereupon, without further action, be cancelled forthwith as of the effective date of the merger, without the necessity that the certificates representing

gin. Those notices gave plaintiff the choice of accepting the defendant's valuation of his interest or taking legal action to protect his position.

Such a reasonable investor would not be simply any member of the investing public, because, as discussed above, that is not the position of plaintiff Vernon Alibert. Such a reasonable investor would instead be the founder and leading force in a closely held family corporation, who had fallen into a dispute with the members of the family who held majority control (Response, pp. 3–6). Such a reasonable investor would be well educated (individual plaintiff styles himself "Dr. Vernon Alibert") (Response, Exhibit F) and would have intimate knowledge of the corporation, even though recent data had been withheld from him. Such an investor would be in a hostile relationship with the majority shareholders, and would be convinced that his interest

was worth substantially more than the price offered in the forced buy-out, a fact known to the majority shareholders (Complaint ¶ 80).

 I find that the inevitable reaction of such a reasonable investor, upon receiving the notices sent to plaintiff, would be to take vigorous action to protect his legal position. And such a hypothetical reasonable investor would have done exactly the same thing if the omitted facts had been disclosed. Because the omitted facts would not have affected the decision which a reasonable investor in plaintiff Vernon Alibert's position would have made concerning the particular question before him, they are not, under the standard of *Basic, Inc., supra,* material omissions which will support plaintiffs' federal cause of action in securities fraud or mail fraud.[9]

For their actions to be fraudulent, the defendants must have intended for plaintiff

such shares be surrendered or marked cancelled:

 (i) The shares of common stock of Columbia held by persons who, immediately prior to the effective date of the merger, are also holders of one or more shares of the Class A Stock of Olvic, shall, upon the effective date of the merger, be converted into the shares of Class A Stock of the Surviving Corporation that are issued and outstanding and held by such persons on the effective date of the merger pursuant to Subparagraph 5(a)(i) above; and

 (ii) The shares of common stock of Columbia held by persons who, immediately prior to the effective date, are also holders of one or more shares of Class B stock of Olvic, shall, upon the effective date of the merger, be converted into the shares of Class B stock of the Surviving Corporation that are issued and outstanding and held by such persons on the effective date of the merger pursuant to Subparagraph 5(a)(ii) above; and

 (iii) *Each share of common stock of Columbia held by a person who is not also a shareholder of Olvic, shall, upon the effective date of the merger, be converted into the right to receive payment in the amount of $29,652 per share* ("Merger Price"). The Merger Price shall be paid to such shareholder after the surrender to the Surviving Corporation of the certificate or certificates for such shares of common stock of Columbia, in the following manner:

 (A) 25% in cash or by check within 60 days after the effective date of the merger; and
 (B) 25% plus interest at the rate of 8% per annum, in cash or by check on each of the first, second and third anniversaries of the effective date of the merger.

The Surviving Corporation shall have the right to prepay all or any portion of the Merger Price at any time or from time to time without premium or penalty.

 (c) *No conversion of any share of any Constituent Corporation shall be made pursuant to Subparagraphs 5(a) or (5(b) above if pursuant to Section 515 of the Pennsylvania Business Corporation Law:*

 (i) *any holder of any share of any Constituent Corporation shall have filed a written objection to this Plan and Agreement of Merger with the Constituent Corporation prior to the commencement of the voting on its Plan and Agreement of Merger by its shareholders at the meeting at which this Plan and Agreement of Merger is submitted to a vote;*

 (ii) *such holder shall not have voted in favor of this Plan and Agreement of Merger;*

 (iii) *within twenty (20) days after the date on which the vote of shareholders approving this Plan and Agreement of Merger is taken, such holder shall have made written demand on the constituent corporation or on the Surviving Corporation for the payment of the fair value of his shares in accordance with the provisions of said Section 515;* and

 (iv) *such holder thus becomes entitled to receive payment of the fair value of his shares in accordance with the provisions of said Section 515.* (Emphasis supplied)

9. I need not and do not decide the question of whether the same omissions would be material in another context, such as settlement negotiations or as evidence in a valuation proceeding.

Vernon Alibert to act in reliance on the alleged misrepresentations. The defendants certainly expected plaintiff Vernon Alibert to act on the notices. The question, in this context, is what kind of action they could reasonably have expected him to take upon receiving the notices.

A fair reading of the merger notices discloses that they are not "take it or leave it" notices, as characterized by plaintiffs, but "take it or litigate it" notices. Under Sections 515 and 908 of the Pennsylvania Business Corporation Law, 15 P.S. §§ 1515 and 1908, a dissenting shareholder has a statutory right to have the value of his shares determined in a court proceeding.

In addition to the statutory rights specified in 15 P.S. § 1515 and § 1908, plaintiff has common law remedies under Pennsylvania law. *See, e.g. Herskowitz v. Nutri/System, Inc.,* 857 F.2d 179 (3rd Cir. 1988), *Dower v. Mosser Industries, Inc.,* 648 F.2d 183 (3rd Cir.1981), *In re Jones & Laughlin Steel Corp.,* 488 Pa. 524, 412 A.2d 1099 (1980), *Weisbecker v. Hosiery Patents, Inc.,* 356 Pa. 244, 51 A.2d 811 (1947).

Defendants were on notice that plaintiff Vernon Alibert objected to the terms of merger proposed in the notices (Complaint ¶ 80). These objections could fairly be characterized as vehement. Consequently defendants reasonably could have expected a written objection, pursuant to Section 515 of the Pennsylvania Business Corporation Law, 15 P.S. § 1515, which would have precipitated a legal action in Pennsylvania courts to determine the fair value of plaintiffs' interest. They also reasonably could have anticipated that, prior to the noticed shareholders' meeting, plaintiff Vernon Alibert would have asserted his common law rights to seek an injunction against the mergers and to seek a valuation of his interest.[10] They could not, reasonably, have expected him to accept their offer, which represented only two-thirds of his lowest demand, and 39 per cent of his first demand, at face value. Indeed, plaintiff

Vernon Alibert does not assert that he did so.

Plaintiffs have alleged nine mailings in connection with the scheme. Actually these are three mailings, each of which contained the appropriate notices for each of the old companies (See Complaint, Exhibits F–N and Response, Exhibit N). Of these sets of notices, only two of them were required by 15 P.S. § 1902 and therefore in furtherance of the forced buy-out: the notices of the Directors' meetings to be held on March 25, 1988, mailed on March 11, 1988, and the notices of the shareholders meeting to be held on April 12, 1988, mailed on March 25, 1988. The mailing on June 27, 1988 was not in furtherance of the scheme, but was notice to plaintiff Vernon Alibert that the forced buy-out had been consummated.

■ Assuming, *arguendo*, that the mailings were fraudulent, the plaintiffs have sufficiently alleged that mailings were made and that they were related to furtherance of the defendants' purpose. However, there were only two mailings in furtherance of that purpose. These mailings, were made on behalf of three members of a family and directed to one member of the same family, both were made within a single month with the object of consummating the forced buy-out early in the next month.

This recitation of "predicate acts" does not satisfy the "continuity" and "pattern" requirement as enunciated in *H.J., Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989):

> "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement:* Congress was

---

10. Paragraph 9 of the Plan and Agreement of Merger for each of the Old Companies permit the Board of Directors to terminate the merger process if there is material adverse litigation

pending or threatened (¶ 09(b)(ii)) or if a minority shareholder asserts his rights under § 515 of the Pennsylvania Business Corporation Law, 15 P.S. § 1515 (¶ 9(b)(iii)).

concerned in RICO with long-term criminal conduct.

... A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long term racketeering activity, either implicit or explicit ... Though the number of related predicates may be small and they may occur close together in time, the racketeering acts themselves [may] include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of the ongoing entity's regular way of doing business ..." (emphasis supplied)

*Id.,* ── U.S. at ──, 109 S.Ct. at 2902.

### 4. NEXUS

■ Finally, as in the federal cause of action for securities fraud, even assuming, *arguendo,* that the notices contained material misrepresentations, the plaintiffs have not alleged that they took any detrimental action in reliance on the notices. In fact, plaintiffs have alleged (Complaint ¶¶ 61 & 67) that plaintiff Vernon Alibert never received the notices, rendering his detrimental reliance on them impossible.

■ In their discussion of the RICO cause of action, plaintiffs argue that even in the absence of mail fraud [or, arguably, securities fraud] there is a RICO cause of action because of "the many illegal acts of the Defendants which qualify as predicate offenses and constitute a pattern of racketeering activity under the RICO statute" (Response Section IV, p. 23). In their response, plaintiffs continue:

"In this case the Plaintiffs have alleged an extensive pattern of illegal acts going back as far as 1981 (See Complaint, paragraphs 23 et seq.). Those acts included the illegal ouster of Vernon Alibert from his positions with the three corporations; the Defendants' repeated refusals to record Vernon Alibert's stock sales to Plaintiff Ferdinand Drexel; the Defendants' illegal termination of Ver-

non Alibert's salary payments; the Defendants' failure to notify Vernon Alibert of annual meetings of the respective boards of directors after 1981; the Defendants' failure to notify Vernon Alibert notice [sic.] of annual shareholders' meetings of the respective corporations after 1981; the Defendants' failure to give the Plaintiffs' the merger notices required by law; and the Defendants' refusal to give Vernon Alibert an accounting of and distribution of the accrued pension benefits he was due from Columbia I.

The pattern of illegal acts alleged in the Complaint further includes the Defendants' conspiring to cause and causing the merger, through all of the enumerated illegal acts including multiple uses of the United States mail, for the sole purpose of eliminating Vernon Alibert as a minority shareholder and thereby unjustly enriching themselves; the Defendants' failure to disclose to the Plaintiffs that they were engaged in negotiations to sell the surviving corporation (sic.) after the merger; the Defendants' failure to make any provisions in the merger terms for the shares of the respective corporations owned by Ferdinand Drexel; the Defendants' gross undervaluation of the Plaintiffs' shares of the corporations in connection with the merger; the Defendants' alteration of the books and records of the corporations to support the undervaluation of the stock; the Defendants' failure to notify the Plaintiffs of the method used to value the stocks in connection with the merger; and the Defendants' refusal to pay Vernon Alibert more than $329,-000.00 in retained earnings from Columbia I which are due and owing."

(Response, p. 24). In their analysis, plaintiffs have confused the concept of "illegal acts", i.e., acts "against or not authorized by law", with the definition of "racketeering activity" under RICO. "Illegal acts" can be civil or criminal. To state a civil cause of action under RICO there must be allegations of at least two criminal acts of racketeering activity as defined in 18 U.S.C. § 1961(1).

█ The application of this principle is demonstrated in RICO cases cited by plaintiffs in their brief and at oral argument. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the allegation was multiple acts of mail and wire fraud, namely fraudulent invoices mailed or wired to plaintiffs, on which plaintiff allegedly relied to its detriment. The trial court had dismissed the action on the ground that there had been no prior criminal conviction of the predicate acts and no distinct "racketeering injury". The Second Circuit affirmed. The Supreme Court reversed, holding that a prior criminal conviction was not required to support a civil action under RICO and that there is no requirement for a distinct "racketeering injury". The Court remanded the case to determine whether the defendants had actually committed the required predicate acts of racketeering activity, namely, mail fraud and wire fraud.

In *Barticheck et al. v. Fidelity Union Bank/First National State*, 832 F.2d 36 (3rd Cir.1987) the existence of mail fraud was unquestioned, as was the causal nexus between the fraud and the harm to plaintiffs. The only question was whether the "pattern" requirement had been met. Plaintiffs cite the following from *Barticheck* in support of the proposition that there can be a RICO cause of action in the instant case independently of mail fraud:

> "[W]e believe the district court erred in concluding that the plaintiffs failed to allege a RICO pattern. Although the complaint states only that the defendants committed 'two or more' *acts of mail fraud* in furtherance of their alleged scheme, it may fairly be inferred from the nature of the scheme that defendants engaged in considerably *more than two such acts* ... Most significantly, the scheme involved the repetition of similar misrepresentations to more than twenty investors. To refer to such conduct as a 'pattern' of fraudulent activity certainly comports with the ordinary understanding of the term, and we believe that this conduct properly falls within the reach of the RICO statute.

\* \* \* \* \* \*

[T]he existence of a RICO pattern does not turn on the abstract characterization of racketeering acts as 'continuous' and 'related' but rather on a combination of specific factors such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." [Citations omitted]. (Emphasis supplied)

*Barticheck*, supra, 832 F.2d 36, 39–40. The problem with the plaintiffs' analysis of the instant case in the light of *Barticheck*, supra, is that in *Barticheck* there were multiple instances, over a substantial period of time, of a statutory predicate act, namely mail fraud, aimed at a substantial number of victims. In the instant case there are not.

In *Town of Kearny, v. Hudson Meadows Urban Renewal*, 829 F.2d 1263 (3rd Cir. 1987) the predicate acts were instances of bribery, which is one of the crimes enumerated in 18 U.S.C. § 1961. There were questions involving the enterprise, pattern and racketeering injury issues, but no question that one of the enumerated crimes, bribery, had been alleged, or that the bribery had a nexus with the harm to plaintiff.

In *H.J., Inc.*, supra, cited by plaintiffs at oral argument, the Court said:

> "Petitioners' complaint alleges that at different times over the course of at least a 6–year period the noncommisioner respondents gave five members of the MPUC numerous bribes, in several different forms, with the objective—in which they were allegedly successful—of causing these Commissioners to approve unfair and unreasonable rates for Northwestern Bell. RICO defines bribery as a 'racketeering activity,' 18 U.S.C. § 1961(1), so petitioners have alleged multiple predicate acts.
>
> Under the analysis we have set forth above, and consistent with the allegations in their complaint, petitioners may be able to prove that the multiple predicates alleged constitute a 'pattern of racketeering activity,' in that they satis-

fy the requirements of relationship and continuity."

*H.J., Inc., supra,* —— U.S. at ——, 109 S.Ct. at 2906.

In this action, the only crimes enumerated in 18 U.S.C. § 1961 which have been alleged, or are conceivable, are securities fraud and mail fraud. The other "illegal acts" alleged by plaintiffs are acts which may conceivably state civil causes of action under Pennsylvania law, but do not constitute "racketeering activity" under RICO.

I find that the allegations of the Complaint, as supported by plaintiffs' Response and exhibits, do not sufficiently allege the necessary elements of securities fraud or mail fraud. I further find that, by reason of the refusal by plaintiff Vernon Alibert to accept delivery of the notices, the necessary causal nexus for a cause of action under RICO, in addition to not being alleged, is rendered impossible. I further find that, assuming, *arguendo*, that securities fraud, mail fraud and causal nexus had been sufficiently alleged, the allegations of securities fraud and mail fraud do not meet the pattern requirement of RICO as set forth in *Sedima* and *H.J., Inc., supra.* Without the necessary pattern of racketeering activity and causal nexus, there is no cause of action under RICO.

AMENDMENT

██ I have considered whether to permit plaintiffs to amend their Complaint. I have determined that there are no amendments which plaintiffs could make in good faith, based on the record before me, which would overcome the fundamental deficiencies of their Complaint. These deficiencies are first and foremost, the absence of detri-

mental action by plaintiff Vernon Alibert in reliance on any fraudulent misrepresentations by the defendants, followed by the absence of material misrepresentation, the absence of any nexus between the alleged fraudulent acts of the defendants and the harm to plaintiffs and the absence of a sufficient pattern of statutory predicate acts.

On the record before me, it would be inherently incredible for plaintiffs to allege, for example, that in failing to open or take action on the notices mailed to him plaintiff Vernon Alibert was acting in reliance on his perception of the good faith of the defendants. Or to allege that, although they never received the notices, plaintiff Vernon Alibert was aware of their contents and that plaintiff Vernon Alibert's inaction was based on his reliance on the fairness of the terms set forth in those notices. The Complaint is replete with recitations of the bad faith that existed between plaintiff Vernon Alibert and the defendants, a point which plaintiffs have continued to emphasize in the Response, at oral argument and in plaintiffs' letter to the Court dated October 11, 1989.[11]

It would be incredible for Plaintiffs to allege that, had plaintiff Vernon Alibert received the notices of the meetings, he would have accepted the offered terms, relying on the defendants' valuation of his interest. In addition to the bad faith discussed above, it is significant that plaintiff Vernon Alibert's *lowest* valuation of his interest was 50% higher than that offered by defendants in the notices, a matter of a million dollars.

Plaintiffs cannot allege that the notices gave plaintiff Vernon Alibert no option but

---

**11.** At oral argument, plaintiffs introduced Statements of Financial Condition of Alibert Properties, Inc., August 31, 1986 and August 31, 1985. The document shows a value for Alibert Properties I over three times the value indicated in the Plan and Agreement of Merger. I reserved ruling on acceptance of this document pending review by defendants. Defendants, by letter dated October 10, 1989 objected on the grounds that the document was not properly verified as provided by Fed.R.Civ.P. 56[(e)] and of irrelevance. By letter dated October 11, 1989 plaintiffs argued that the document was relevant to showing an issue of material fact, namely defen-

dants' motivations regarding the mergers. On October 12, 1989 plaintiff Vernon Alibert submitted an affidavit supporting the document. I accept the document into the record of this case as Exhibit P–1. It does nothing to help plaintiffs' argument on the issues before the Court. If anything Exhibit P–1 underscores plaintiff Vernon Alibert's perception of the unfairness of the terms of the Plan and Agreement of Merger of Alibert Properties I, and the unreasonableness of supposing that he could have been induced by the representations of the defendants to accept them at face value.

to accept the defendants' valuation. He had many statutory and common law remedies available to him.

In considering the issue of RICO pattern, I have considered not only the skeletal RICO claim of plaintiffs but all of the allegations of the 96 paragraph Complaint. I have also considered the allegations of the Response and the factual evidence in the exhibits. I can find no conceivable way in which those allegations or facts could be reformed into the necessary pattern to support the RICO cause of action.

## CONCLUSION

Taking, as I must, the facts as recited by plaintiffs (a recitation to which defendants take strong exception), I feel compelled to make the following observations about plaintiffs' case. Defendants' offer of approximately $2 million for plaintiff Vernon Alibert's interest in the Old Companies may not represent the fair value of his interest. But plaintiffs' harm is a self inflicted wound, caused by plaintiff Vernon Alibert's wilful and unjustified failure to read his mail and his unreasonable failure to take prompt action to protect his substantial interests. Plaintiffs' remedy is under the laws of the Commonwealth of Pennsylvania, not under the federal securities or racketeering laws.

If defendant Vernon Alibert's actions in this case gave rise to a federal cause of action for securities fraud or racketeering, it would be difficult to imagine an exercise of rights under the Pennsylvania Business Corporation Law which would not give rise to such a federal cause of action.

Plaintiffs have made fundamental philosophical mistakes in bringing both the federal securities fraud and the RICO causes of action. They have confused criminal offenses, which are offenses against the state where an attempt may be sufficient to sustain guilt, with a civil causes of action, where the plaintiff's harm must have been caused the alleged wrongful acts. They have confused the "overt acts" found in a criminal RICO indictment with the criminal "predicate acts" required for a RICO civil cause of action. They have confused bad motives with fraud, and over-reaching and breach of fiduciary duty with criminal racketeering acts.

Most fundamentally, plaintiffs have mistakenly invoked the limited jurisdiction of the federal courts. They have sought to bring a family disagreement, involving state law tortious behavior and breach of contract, under the civil remedies of the federal securities and racketeering statutes, which provide civil remedies for specific federal crimes.

I venture no further opinion about the various claims alleged under Pennsylvania law. Since there are no federal causes of action in securities fraud or under RICO, there is no basis for exercising pendent jurisdiction over the state law claims, and I will dismiss the entire Complaint for lack of federal jurisdiction.

An appropriate order follows.

## ORDER

AND NOW, this 17th day of October, 1989, upon consideration of defendants' Motion to Dismiss or, in the Alternative, for Summary judgment, plaintiffs' response thereto and supporting memoranda and correspondence, and after oral argument on October 6, 1989, for the reasons given in the attached Opinion IT IS ORDERED that:

1. With respect to plaintiffs' federal claims, under the Securities Act of 1934, 15 U.S.C. § 78j. and the regulations promulgated thereunder, 17 C.F.R. § 240.10b–5 and under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, judgment is entered in favor of defendants Victor F. Alibert, Olive E. Alibert, Columbia Research Laboratories, Inc., Alibert Industries, Inc. and Alibert Properties, Inc., and against plaintiffs Ferdinand Drexel Investment Co., Inc., Vernon F. Alibert, individually and Vernon F. Alibert on behalf of Columbia Research Laboratories, Inc., Alibert Industries, Inc., and Alibert Properties, Inc.

2. Plaintiffs' state law claims are dismissed for lack of federal jurisdiction, without prejudice to the right of plaintiffs to

raise those issues or related state law issues in the courts of the Commonwealth of Pennsylvania.