926 F.2d 289
 Fed. Sec. L. Rep. P 96,100, 19 Fed.R.Serv.3d 381,
RICO Bus.Disp.Guide 7709
 SOWELL, John B.
v.
BUTCHER & SINGER, INC. Grey, Thomas A., Bennett, Samuel J.
and I.G.E., Inc.
Appeal of John B. SOWELL, individually and on behalf of all
others similarly situated.
 No. 90-1414.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 13, 1990.
Decided Feb. 21, 1991.
 
 Niels Korup (argued), Spector, Gadon & Rosen, P.C., Philadelphia, Pa. and Robert Stull, Stull, Stull & Brody, New York City, for appellant.
 Edward C. Mengel, Jr. (argued), Ellen K. Burrows, and Yvette M. Kostelac, White & Williams, Philadelphia, Pa., for appellees, Butcher & Singer, Inc. and Thomas A. Grey.
 John A. Luchsinger (argued), Luchsinger & Noel, P.C., Media, Pa., for appellee Samuel J. Bennett.
 Before SLOVITER, Chief Judge,* and MANSMANN, Circuit Judge, and SAROKIN, District Judge.**
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 This appeal requires that we determine whether the district court erred in directing a verdict for the defendants in an action alleging fraud and misrepresentation in connection with the purchase and sale of securities. The plaintiff, John B. Sowell, represents a certified class of plaintiffs who purchased shares of stock in I.G.E., Inc. during the period between August of 1977 and June of 1981. The plaintiff named as defendants Butcher & Singer, a securities broker/dealer having its principal place of business in Philadelphia, Thomas A. Grey, a Butcher & Singer trader and first vice president, and Samuel J. Bennett, a former Butcher & Singer assistant vice president, vice president, and registered representative. The complaint alleged that these defendants committed violations of state and federal securities laws, engaged in conduct in violation of the Racketeer Influenced and Corrupt Organizations Act, and committed acts of fraud, deceit and negligence under Pennsylvania state law.
 
 
 2
 Several claims were dismissed upon the defendants' motion for summary judgment and, at trial, the only claims remaining were those based on RICO, 18 U.S.C. Sec. 1961-1968, common law fraud, and those section 10(b), 15 U.S.C. Sec. 78j(b), claims involving stock purchases between February 13, 1981 and June, 1981. At the close of the plaintiff's case, the trial court directed a verdict on all claims in favor of the defendants.
 
 
 3
 The plaintiff now challenges the district court's entry of a directed verdict. The plaintiff also claims that the district court erred in excluding certain evidence at trial and in dismissing a number of claims as time-barred.
 
 
 4
 While our examination of the issues has been complicated by the district court's failure to articulate the bases for the majority of its rulings, our detailed analysis of the record convinces us that the directed verdict and the evidentiary rulings underlying that verdict can be sustained. We will, therefore, affirm the order of the district court.
 
 I.
 
 5
 While the parties do not agree on every factual detail, we are able to distill from the record those essential historical facts as to which there appears to be consensus. The allegations of wrongdoing in this case center on transactions in the stock of I.G.E., Inc., (IGE), a Massachusetts corporation formed in 1971 as the successor to the business of International Geophysical Explorations, Inc. During the period extending from 1971 through August, 1977, IGE had no revenue and was, in essence, a shell corporation whose principal asset was a 1/64 royalty interest in an off-shore oil and gas concession near Honduras.
 
 
 6
 In 1977, Samuel J. Bennett, then a registered representative with Butcher & Singer's Cherry Hill, New Jersey office, was approached by Craig O. Moon. When Moon expressed interest in acquiring control of a dormant corporation, Bennett suggested IGE as a "clean shell" and introduced Moon to IGE management.
 
 
 7
 After a period of negotiation, Moon became president of IGE with the intent to involve the corporation in varied business ventures.[1] Under the terms of the agreement between Moon and the members of the board of IGE, Moon was required to enlist the services of a listed stock brokerage house for the purpose of "creating and maintaining a strong healthy market for IGE stock." Moon again approached Bennett, who agreed to serve as a consultant to IGE and to enlist the services of Butcher & Singer "to make a market" in IGE stock.[2] In return for these services and to compensate him for having brought Moon and the IGE board together, Bennett, or members of his immediate family, were issued 400,000 shares of IGE capital stock. These shares were to be used to create and maintain a "good market situation" in that stock.
 
 
 8
 At approximately the same time that he was given the 400,000 shares, Bennett is alleged to have misappropriated blank IGE stock certificates on which he forged or caused to have forged necessary signatures, certificate amounts, and dates of issuance.[3] None of the stock which Bennett received, either by grant or alleged misappropriation, was registered.
 
 
 9
 In 1977, Bennett requested that Butcher & Singer make a market in IGE stock. Bennett contacted Thomas A. Grey, an over-the-counter securities trader at Butcher & Singer's Philadelphia office and informed him that he, Bennett, had a "good amount" or an "interest" in IGE stock which he wished to sell. On August 22, 1977, Grey, as the trader designated and authorized to handle stocks such as IGE, began market-making efforts on behalf of Butcher & Singer. Grey did not ask Bennett to disclose the number of IGE shares which he owned, did not inquire into the circumstances surrounding Bennett's acquisition of the certificates, and did not place in the Butcher & Singer file the information required by Section 15 of the 1934 Act.
 
 
 10
 Between August 23, 1977 and October 31, 1977, Bennett sold 50,560 shares of IGE stock through Butcher & Singer with both Grey and Butcher & Singer earning commissions on the sales. The plaintiff alleges that, at the time of these sales, Bennett was aware that virtually all of IGE's capital stock was outstanding and that, in an effort to raise revenue, IGE was preparing to effect a 1 for 10 reverse split on the stock issued. The impending reverse split, which did, in fact, occur on November 1, 1977, was not disclosed to the purchasers of IGE stock.[4]
 
 
 11
 The remaining allegations of misconduct on the part of the defendants focus primarily on circumstances surrounding transactions in IGE stock during April, May and June 1979. Prior to that time, the price of IGE stock fluctuated in a narrow range between $1 and $2 per share. In the spring of 1979, however, the price rose dramatically to more than $8 per share. Transactions in the stock increased during this period, with Bennett transferring more than 40,000 shares for over $200,000 in proceeds. During the same period, Grey and other Butcher & Singer officers and employees also traded IGE stock, at a profit, in their own accounts.
 
 
 12
 The parties agree that this increase in the price of and activity in IGE stock resulted from rumors concerning IGE's acquisition of property on which to develop and operate a casino in Atlantic City, New Jersey. Sowell alleges that, by virtue of Bennett's position as a consultant to IGE and his involvement in IGE's casino-related efforts, Bennett knew that the realistic prospects for IGE's acquiring casino property were minimal. Despite this knowledge, Bennett continued to sell IGE stock on the basis of inflated or false rumors.
 
 
 13
 Sowell also alleges misconduct on the part of Butcher & Singer stemming from the Spring, 1979 events. Prior to April, 1979, no one at Butcher & Singer made any effort to determine the source or extent of Bennett's IGE stock holdings. In April, 1979, however, Louis Iannucci, an assistant to Francis Doyle, Butcher & Singer's compliance director, brought the IGE activity in Bennett's account to Doyle's attention.[5] Iannucci had determined that the IGE stock was being sold primarily to other market makers for IGE although some shares had also been sold, on an unsolicited basis, to local customers. Iannucci spoke with Bennett but did not ask him any questions regarding his IGE holdings other than their source. Bennett claimed to have acquired the shares as penny stock during his time as a penny stock trader with another brokerage house during the late 1960's and early 1970's. Doyle asked that the unsolicited nature of IGE sales be confirmed but did not make inquiry or direct that inquiry be made concerning the amount of stock owned by Bennett, previous sales by Bennett, or Bennett's relationship to IGE. No inquiry was made into the registration of IGE stock. Bennett continued to market IGE stock through Butcher & Singer.
 
 
 14
 In early June, 1979, IGE made a public announcement which stated that its casino project was contingent upon receipt of necessary financing. It then became clear that rumors to the effect that IGE was about to build an Atlantic City casino were unfounded. The price of IGE stock dropped to between $2 and $4 per share by the end of 1979. Thereafter, the price remained steady at between $1 to $2 per share through June, 1981.
 
 
 15
 During the period extending from August 23, 1977 through June 23, 1981, Bennett sold some 270,550 shares of IGE stock through Butcher & Singer for proceeds totalling some $546,768.41. Butcher & Singer and Grey received commissions on each of these sales.
 
 
 16
 In 1981, the Securities Exchange Commission, Division of Enforcement, initiated an investigation into trading in IGE stock. At the conclusion of that investigation, a public administrative proceeding was instituted by the Commission's Order for Public Proceedings dated January 13, 1984. Pursuant to this order, a nine-day evidentiary hearing was conducted during April and May, 1984. The administrative law judge found that Butcher & Singer, Bennett, and Grey had willfully violated and willfully aided and abetted violations of Sections 5(a) and 5(c) of the 1933 Act by not inquiring into the source and registration status of Bennett's IGE stock. Butcher & Singer was found to have willfully violated sections 15(c) and 15(b)(4)(E) of the 1934 Act by failing to have certain information in its files prior to publishing quotations and by failing adequately to supervise Bennett and Grey with a view to preventing and detecting their violations. Bennett was also found to have violated the anti-fraud provisions of Section 17(a)(1), 17(a)(2) and 17(a)(3) of the 1933 Act and Section 10(b) and Rule 10b-5 of the 1934 Act.
 
 
 17
 Butcher & Singer, Grey and Bennett appealed the decision of the administrative law judge to the full Commission which rendered its decision in a January 13, 1987 opinion. The SEC's findings were based on an independent review of the record. With certain exceptions, the Commission's findings of fact and conclusions of law paralleled those found by the administrative law judge.[6]
 
 
 18
 In January, 1981, Sowell purchased shares of IGE stock at $2.25 per share through a broker at Prudential Bache. On February 13, 1984, less than one month after the Order for Public Proceedings was issued by the SEC's Enforcement Division, Sowell filed suit against Butcher & Singer, Bennett, Grey and IGE in the United States District Court for the Eastern District of Pennsylvania. In the original complaint, Sowell alleged violations of Secs. 5, 10, 12 and 17 of the Securities Act of 1933, 15 U.S.C. Secs. 77e, 77j, 77l, and 77q; Secs. 10(b), 15 and 20 of the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78j(b), 78o and 78t; and Rule 10b-5, 17 C.F.R. Sec. 2140.10b-5. Sowell also alleged violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1961-1968; the Pennsylvania Securities Act of 1972, 70 Pa.Stat.Ann. Secs. 1-101 to 1-704 (Purdon Supp.1986), and included allegations based on common law fraud.
 
 
 19
 The defendants moved for summary judgment and, on May 13, 1987, those claims based upon sections 5 and 17 of the Securities Act and section 15 of the Exchange Act were dismissed for lack of a private right of action. Most of Sowell's claims based on section 12 of the Securities Act were dismissed as time-barred or on privity grounds. The only viable section 12 claims were those section 12(2) claims asserted by class members who purchased directly from the defendant after February 13, 1981. Summary judgment was not granted as to Sowell's RICO and common law claims, although the plaintiff was required to file an amended complaint as to the RICO issues, pleading the allegations of fraud with greater particularly, and eliminating IGE as a defendant, given that IGE was also alleged to have been an enterprise for purposes of RICO.
 
 
 20
 On October 16, 1987, defendants Butcher & Singer and Grey filed a second motion for summary judgment on the remaining section 10(b) and Rule 10b-5 claims. The district court granted this motion, ruling that all claims involving IGE stock purchases prior to February 13, 1981, were time-barred under our decision in In re Data Access Securities Litigation, 843 F.2d 1537 (3d Cir.1988), cert. denied sub. nom, Vitiello v. I. Kahlowsky and Co., 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). The parties thus prepared to litigate the RICO and common law fraud claims as well as those section 10(b) claims arising from stock purchases made between February 13, 1981 and June, 1981.[7]
 
 
 21
 At the same time that the district court granted the defendants' summary judgment motion based upon the statute of limitations, it granted a motion for partial summary judgment filed by the plaintiff on the issue of liability under section 10(b) and Rule 10b-5. By this motion, Sowell sought to invoke the principle of collateral estoppel with respect to the findings of fact and conclusions of law set forth in the SEC opinions filed by the administrative law judge and the full Commission. In response to Sowell's motion, the district court, without specifically referring to the SEC, ruled in an order dated May 26, 1989, that the following facts were conclusively established for purposes of this litigation:
 
 
 22
 a. That all defendants violated Sections 5(a) and 5(c) of the Securities Act by selling defendant Bennett's forged and unregistered stock.
 
 
 23
 b. That defendant [Butcher & Singer] willfully violated Section 15(c)(2) of the Exchange Act and Rule 15c2-11 by publishing quotations for IGE without having the required information about the company in its possession.
 
 
 24
 c. That defendant Bennett violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 by selling forged stock certificates, by making fraudulent representations to a customer identified as "Mr. C." and by trading in IGE stock without disclosing material inside information.
 
 
 25
 On October 23, 1989, Sowell moved for an order in limine precluding the defendants from introducing evidence to controvert the facts found by the SEC in the prior administrative action. This motion was denied. The defendants also filed a motion in limine seeking to preclude any reference to the prior regulatory proceedings. The district court ruled that while Sowell could refer to the factual findings made by the SEC, he could not make reference to the SEC itself or to the fact that certain actions taken by the defendants were found to have violated provisions of the securities laws. Sowell then presented his case to the jury and, at the conclusion of Sowell's case, the district court directed a verdict in favor of the defendants.
 
 
 26
 On appeal, Sowell contends that he adduced at trial evidence sufficient to have each of his claims submitted to the jury. To the extent that his proof on any one of these claims may have been deficient, Sowell argues that the deficiency resulted from erroneous evidentiary rulings made by the court. Specifically, Sowell challenges the district court's failure to accord full collateral estoppel effect to the findings of fact and conclusions of law made at each level of the SEC proceedings, the district court's ruling preventing any reference to violations of specific sections of the securities laws held established for purposes of this litigation in the court's May 26, 1989 order, the exclusion of Sowell's testimony as to class damages, the exclusion of expert testimony on damages, and the district court's failure to admit a statement made by Bennett in answers to interrogatories served in other litigation to the effect that the IGE stock which he received was "worthless." Sowell also challenges the district court's conclusion that certain of his section 12(2) and 10b-5 claims were time-barred and asserts that the court committed error in refusing to permit discovery surrounding the transfer of Butcher and Singer assets to Wheat First Securities.[8]
 
 
 27
 We have thoroughly examined the record in this case and are satisfied that we need not devote detailed consideration to each of the issues raised on appeal. Because we are convinced that Sowell failed to present evidence on the issue of damages sufficient to withstand a directed verdict under any theory of liability and are convinced as well that this failure was not the result of erroneous evidentiary rulings, we are able to sustain the district court's entry of a directed verdict.
 
 II.
 
 28
 Before we turn to the substance of this appeal, we feel compelled to note that our review of this matter has been complicated by the district court's failure to articulate the bases for many of its rulings. This failure occurs in the context of evidentiary rulings and in the grant of the directed verdict itself.
 
 
 29
 The district court's failure to discuss the reasoning underlying the entry of the directed verdict is particularly troubling. Each of the plaintiffs' theories of recovery required proof of multiple elements and even a close reading of the record does not reveal upon which of these elements the district court focused in directing the verdict. In moving for a directed verdict, the defendants claimed that Sowell had failed to meet his burden of proof on the issues of causation, damages, the RICO statute of limitations, the degree of fraud required under RICO, and the element of reliance. Granting the motion for directed verdict, the district court stated, "Based upon the evidence and the arguments of counsel, I am granting the defendants' motion and entering a judgment or verdict in favor of the defendants against the plaintiff. That's it."
 
 
 30
 The parties, forced to resort to speculation, were hampered in focusing argument both in their briefs and in oral presentation before us. The efficiency of our review has also been adversely affected by the need to evaluate multiple grounds upon which the district court ruling might have been based.
 
 
 31
 This is not the first time that we have addressed the difficulties posed by a district court's ruling without explanation. In Vadino v. A. Valey Engineers, 903 F.2d 253, 258 (3d Cir.1990) we detailed our attempts "to encourage the district courts to explain the basis of their judgments ..." and noted that, at least in the context of summary judgment orders, "[o]ur attempts to resolve by persuasion the difficult situation presented to the parties and this court by such orders have obviously been unsuccessful." Id. In Vadino, we invoked our inherent supervisory power to require the district courts of this circuit to set forth the grounds upon which a summary judgment order rests. We reviewed prior instances in which this supervisory power has been invoked and recognized that its use is particularly appropriate where it serves to preserve the integrity of the process of appellate review.
 
 
 32
 Much of our reasoning in Vadino applies with equal force to the need for some statement of reasons underlying the granting of a directed verdict. Where the district court fails to explain the factors upon which it relied, our focus is compromised and we are left "without a reasoned basis upon which to found our review." Vadino at 258.
 
 
 33
 While we adhere firmly to the view that our supervisory power should not be invoked lightly, we believe that circumstances warrant its application here. In the interest of the parties' ability to present relevant appellate argument, efficient allocation of judicial resources, and effective appellate review, we now exercise our supervisory power to require that each district court in this circuit entering a directed verdict in a case before it set forth "an explanation sufficient to permit this court to understand the legal premise for the court's order." Vadino at 259.
 
 
 34
 In the case now before us, we have analyzed each element of the plaintiff's claims in light of the record, the parties' briefs, and extended oral argument. Because we are convinced that Sowell did not meet his burden of proof with respect to damages, we necessarily conclude that he failed to establish a prima facie case under any of the theories of recovery upon which this case was tried. Thus, while we are unable to divine the precise grounds upon which the district court relied in granting the directed verdict, we find it unnecessary to remand this matter for explanation of the order.
 
 III.
 
 35
 "Our review of the grant of directed verdict is plenary and we apply the same standard as would the district court in passing on the motion originally." Frank Arnold Contractors, Inc. v. Vilsmeier Auction Co. Inc., 806 F.2d 462, 463 (3d Cir.1986). We will sustain the district court's grant of a directed verdict where "there is insufficient evidence from which a jury could reasonably find for the opponent, the court viewing the evidence in the light most favorable to the opponent, and giving him the advantage of every fair and reasonable inference." Laskaris v. Thornburgh, 733 F.2d 260, 264 (3d Cir.) cert. denied, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984). We believe that Sowell's evidence with respect to damages, even when viewed in the light most favorable to him, and with all reasonable inferences drawn in his favor, was insufficient to permit a rational juror to conclude that Sowell had satisfied his burden of proof with respect to any theory of liability presented at trial.
 
 
 36
 As we have indicated, trial in this matter was limited to claims based on common law fraud, RICO, and 10b-5 violations arising from transactions in IGE stock occurring between February 13, 1981 and June, 1981. In order to have his case submitted to the jury, Sowell was required to present evidence sufficient to make out a prima facie case with respect to each of these claims. We turn, therefore, to the specific elements of each of the relevant claims.
 
 
 37
 With respect to common law fraud, Sowell was required to show the following:
 
 
 38
 1. a misrepresentation;
 
 
 39
 2. a fraudulent utterance thereof;
 
 
 40
 3. an intention by the maker that a recipient will thereby be induced to act;
 
 
 41
 4. justifiable reliance by the recipient upon the misrepresentation; and
 
 
 42
 5. damage to the recipient as the proximate result of the misrepresentation.
 
 
 43
 Ferdinand Drexel Investment Co., Inc. v. Alibert, 723 F.Supp. 313 (E.D.Pa.1989), aff'd, 904 F.2d 694 (3d Cir.1990).
 
 
 44
 The elements of a section 10b-5 violation are similar. In order to prevail on a section 10b-5 claim, a plaintiff must show that:
 
 
 45
 1. a security was sold or purchased accompanied by a misrepresentation or omission of a material fact;
 
 
 46
 2. defendant acted with scienter;
 
 
 47
 3. the plaintiff justifiably relied on such misrepresentation in connection with the purchase or sale of a security; and
 
 
 48
 4. the plaintiff suffered damage as a result of the misrepresentation or omission.
 
 
 49
 Angelastro v. Prudential Bache Securities, 764 F.2d 939, 942 (3d Cir.), cert. denied, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); Ketchum v. Green, 557 F.2d 1022, 1025 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977); Cammer v. Bloom, 711 F.Supp. 1264, 1276 (D.N.J.1989).
 
 
 50
 Sowell asserted at oral argument that his civil RICO claim was based upon 18 U.S.C. Secs. 1962(b) and 1962(c). In order to prevail under 1962(b), a plaintiff must show that:
 
 
 51
 1. a defendant person;
 
 
 52
 2. acquired or maintained an interest in or control of;
 
 
 53
 3. an enterprise (engaged in, or the activities of which affect interstate or foreign commerce);
 
 
 54
 4. through a pattern of racketeering activity.
 
 
 55
 Brown & Lieberman, RICO Basics: A Primer, 35 Vill.L.Rev. 865, 870 (1990). The essential elements of 1962(c) differ slightly and include:
 
 
 56
 1. a defendant person;
 
 
 57
 2. employed by or associated with;
 
 
 58
 3. an enterprise (engaged in or the activities of which affect interstate or foreign commerce);4. who conducts or participates in the affairs of the enterprise;
 
 
 59
 5. through a racketeering activity.
 
 
 60
 Id. It is section 1964(c) which creates a civil cause of action based upon a RICO violation. This section provides that an action may be brought by "[a]ny person injured in his business or property...." (Emphasis added.)
 
 
 61
 Clearly, a common thread running through each of the viable theories of Sowell's case is the necessity for proof of damages flowing from the defendants' conduct.[9] The defendants argue vigorously that Sowell failed to establish requisite damages and urge us to sustain the district court's entry of a directed verdict on this ground.
 
 
 62
 While the caselaw involving securities fraud indicates that damages may be measured in several ways, i.e., through theories of "out-of-pocket" losses, "benefit of the bargain" and recission, in both section 10b-5 and common law fraud actions a plaintiff's damages are most commonly calculated as the difference between the price paid for a security and the security's "true value". "The proper measure of damages to reflect the loss proximately caused by the defendants' deceit is the out-of-pocket rule. That rule is the traditional measure of damages in a Rule 10b-5 action...." Huddleston v. Herman & MacClean, 640 F.2d 534, 555 (5th Cir.1981) modified on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). See also Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1974); Thomas v. Duralite Co. Inc., 524 F.2d 577, 586 (3d Cir.1975); and Kaufman v. Mellon Nat'l Bank & Trust Co., 366 F.2d 326, 331 (3d Cir.1966).
 
 
 63
 This "out of pocket measure" was the theory under which Sowell proceeded at trial. Sowell, then, was required to come forward with evidence to establish not only the amounts paid by the class plaintiffs for IGE stock on purchase dates during the class period, but with evidence as well of the "true value" of the IGE stock on those dates; i.e., the price paid minus the inflation attributable to the defendants' alleged wrongful acts. "[It] is incumbent upon plaintiffs to provide evidence of the 'true value' of the securities for each date on which members of the class purchased during the class period." Beissinger v. Rockwood Computer Corp., 529 F.Supp. 770, 788 (E.D.Pa.1981).[10] With these general principles in mind, we turn to the damage evidence which Sowell presented at trial.
 
 IV.
 
 64
 Given the factual complexity of this case and the length of time available for case preparation,[11] Sowell's evidence with respect to damages was remarkably spare. As we have stated, the "out-of-pocket" damage theory required that Sowell prove the difference between the price at which class members purchased IGE stock and the "true value" of the same stock, i.e., the value which the market would have assigned to the stock had there been no wrongdoing on the part of the defendants.
 
 
 65
 The record reveals that the class members made IGE stock purchases on different dates through different brokerage houses. In attempting to prove the purchase price paid by the class as a whole or by individual class members, Sowell introduced no direct evidence of the plaintiffs' individual transactions through either the confirmation slips of the various brokerage firms[12] or through the customers' own records. Aside from Sowell's testimony with regard to his own purchase, there was no specific evidence with respect to the price paid for IGE stock by any individual shareholder.
 
 
 66
 Sowell sought, instead, to prove class-wide damages by using an average-price concept based upon his own extrapolations from the IGE transfer reports and Butcher and Singer quarterly reports. IGE acted as its own transfer agent. Its transfer records showed how many shares of IGE stock had been transferred on a given date during the class period. The Butcher & Singer quarterly reports summarized the quantity of IGE stock sold through Butcher & Singer and the price paid on a particular day. Sowell testified that he had examined IGE transfer records, determined which transfers were made on behalf of class members and then excluded, by common sense, recorded transactions which did not represent sales and/or sales made to those not members of the class. Having determined that a particular day's transfer was the result of a qualifying sale, Sowell then turned to the Butcher & Singer quarterly reports. For each day on which Sowell determined that a transfer of IGE stock had occurred, he took the high and low prices paid for the stock on that date and obtained an average price. This average price was then multiplied by the number of shares indicated in the IGE transfer records. By applying this method to each sale date during the class period, Sowell claimed that he was able to arrive at a reliable class-wide purchase price for IGE stock.
 
 
 67
 When Sowell attempted to detail his examination of IGE transfer records in order to establish how he had characterized particular transfers, counsel for the defendants objected on the ground that Sowell's testimony constituted impermissible expert testimony by a lay witness. The following exchange took place:
 
 
 68
 Mr. Luchsinger: Your Honor, my objection is the other side of the coin. He's not qualified to exclude members of the class, he's not qualified to include members of the class. If all we're talking about is the bear [sic] bone record of the number of transfers during the time frame, I have no objection to that. That's something that I agree with plaintiff's counsel any of us can come up with. But including or excluding people from class my position is not within the purview of this gentleman's expertise or ability or representation of him as a witness in this case.
 
 
 69
 * * * * * *
 
 
 70
 [The Court]: Can you tell this Court what procedure you follow in order to get--to make the determination as you say that you reached?
 
 
 71
 [Mr. Sowell]: Well, it's a common sense approach because what you want to do is to go through the documents that are the stock transfer ledger which represents shares being transferred on the ledger book. You want to eliminate every possible person that you can identify and eliminate as not a member of the class. Now, I have to get, you know, my attorneys and different people to help me in order to do this properly, but I personally did this. I went through every ledger entry in these two documents and made this determination.
 
 
 72
 Mr. Luchsinger: Your Honor, that's precisely the nature of my objection, that he had other people help him, tell him what to do, and how to do it. And so what we're--that's my objection on the grounds we discussed before.
 
 
 73
 Mr. Korup: He has to learn, Your Honor, from somebody.
 
 
 74
 The Court: Objection is sustained.
 
 
 75
 Sowell challenges this ruling, arguing that it was error for the district court to exclude his testimony.
 
 
 76
 We find no abuse of discretion in the district court's exclusion of Sowell's testimony. Rule 701 of the Federal Rules of Evidence permits lay witness testimony based upon opinion or inference only where "those opinions or inferences ... are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." The opinions and inferences which Sowell drew from IGE transfer records were clearly based on more than his own perceptions. He testified that he "[had] to get, you know, [his] attorneys and different people to help [him] in order to do this properly."[13]
 
 
 77
 Even were we to determine that Sowell should have been permitted to testify based upon his analysis of IGE stock transfer records and the Butcher & Singer quarterly reports, we would still be forced to conclude that the damage analysis was fatally flawed. The validity of Sowell's average price approach to calculating damages in this case cannot be accurate unless the date of sale of IGE stock is the same as the date of transfer. Elizabeth Dougherty, IGE's transfer agent, testified that transfers of IGE stock were not necessarily recorded in the transfer records on the date of the actual stock transactions and that, therefore, the transfer records were not always a reliable indicator of the date of sale. The following excerpts from Dougherty's testimony illustrate the problems inherent in Sowell's attempt to establish the price paid for IGE stock by matching Butcher & Singer's average price on a particular date to transactions reflected in IGE's transfer records:
 
 
 78
 Q: Now when you did a transfer was there any way for you to tell whether the person transferring stock or were getting the stock transferred to them had paid any money and, if so, how much?
 
 
 79
 Ms. Dougherty: I had no knowledge of that.
 
 
 80
 Q: And there was no way for you to tell one way or the other?
 
 
 81
 Ms. Dougherty: I wasn't even aware of it.
 
 
 82
 * * * * * *
 
 
 83
 Q. Was there any way for you to tell when the transferror had actually sold or bought or given away stock? You just knew when he sent them in for transfer, right?
 
 
 84
 Ms. Dougherty: That's right.
 
 
 85
 The problem highlighted by Ms. Dougherty's testimony is not the only difficulty with Sowell's approach. We are also troubled by the fact that all of the prices for IGE stock would have been derived from Butcher & Singer records. It is undisputed that many of the class plaintiffs, including Sowell himself, purchased IGE stock through other brokerage firms. Over the class period, there were at least nine other market makers in IGE stock.
 
 
 86
 Sowell attempts to overcome this difficulty by arguing that the Butcher & Singer records accurately reflect market-wide activity in IGE stock on a given day. Defendant Grey testified that he did not conduct the market in IGE stock but sold only at the price which the market would bear. Thus although Sowell failed to produce any direct evidence of what any individual plaintiff, other than Sowell himself, paid for IGE stock, he argues that he should have been able to use the price information contained in the Butcher & Singer quarterly reports as a sample of what was happening in the market as a whole. At oral argument, however, counsel for Sowell was unable to specify the total number of relevant transactions in IGE stock over the class period or to calculate what percentage of these transactions had been conducted through Butcher & Singer. In sum, we believe that even had Sowell been permitted to testify as he wished, his evidence with respect to the purchase price of IGE stock was deficient.
 
 
 87
 Sowell's evidence as to the "true value" was also inadequate. At trial, Sowell contended that the true value of IGE shares sold to the class plaintiff was zero; the shares were worthless. The only evidence offered in support of this calculation was found in a statement made by Bennett in a Request for Admissions served in related litigation. The relevant request and Bennett's answer read as follows:
 
 
 88
 7. Bennett was made a paid consultant to IGE.
 
 
 89
 Denied. The only compensation that I received was worthless stock given to me by Craig Moon, allegedly for services rendered.
 
 
 90
 Sowell argued that this statement by Bennett should be admitted and construed as an admission sufficient to establish, for the purposes of this case, that IGE stock had no value at the time that the class members purchased shares. The defendants objected to the admission of this evidence and, at a sidebar conference--most of which was inaudible on the recording made--the district court sustained the objection.
 
 
 91
 While we are unable to determine the grounds for the district court's exclusion of Bennett's statement, we note the defendants' arguments that Bennett's statement was not an admission but a qualified denial. The defendants contend that Bennett's answer to a question addressing his relationship to IGE should not bind him on a completely unrelated matter and, in any event, should not bind the remaining defendants. They further argue that Rule 36 of the Federal Rules of Civil procedure which governs requests for admission "was not designed as a substitute for trial, but instead was intended to serve the very limited purpose of addressing uncontroverted facts." We find support for the defendants' argument in the rule itself. Subdivision (b) of Rule 36 of the Federal Rule of Civil Procedure reads in part:
 
 
 92
 Any admission made by a party under this rule is for the purpose of the pending action only and is not an admission for any other purpose nor may it be used against the party in any other proceeding.
 
 
 93
 Based on the clear language of Rule 36, we conclude that the district court did not abuse its discretion in excluding Bennett's statement.
 
 
 94
 In any event, Bennett's statement would have been of limited value in establishing the worth of the IGE shares purchased by the class plaintiffs. While Bennett's response might be read as some evidence that the stock which Bennett received had no value at the time that he received it, the sentence, without more, says little about the value of the shares on the different dates on which the class plaintiffs made purchases. The record reflects changes in IGE's holdings and activities from the time that Bennett received stock through the class period. While the corporation was dormant when Bennett received shares, there is evidence in the record to suggest that IGE acquired at least some assets and involved itself with various business enterprises over the class period. Bennett's statement cannot be stretched to support the conclusion that IGE stock was worthless at all times.
 
 
 95
 Sowell points to no evidence, other than Bennett's statement, which was offered to establish the true value of the IGE shares purchased by the plaintiffs. At trial, Sowell contended that because the stock was unregistered and because some unspecified percentage of the shares sold to unidentified plaintiffs had been derived from forged certificates, IGE stock, as a whole, was worthless.
 
 
 96
 We think it clear that while the fact that a stock is unregistered will have an impact on its value, the lack of registration does not automatically reduce the value of the stock to zero. See, e.g., Hagerman v. Yukon Energy, 839 F.2d 407, 412 (8th Cir.), cert. denied, 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 40 (1988) (evidence presentedshowing restrictions on transferability of unregistered shares has the effect of reducing market value); Holmes v. Bateson, 583 F.2d 542, 563 (1st Cir.1978) (where stock was unregistered and not freely transferrable, expert calculated 30% reduction in market value).
 
 
 97
 The impact of a forgery of some portion of IGE stock on the true value of the shares purchased by the class plaintiffs presents a more difficult issue. Unfortunately, Sowell offered no evidence at trial to establish which shares of IGE stock were derived from forged certificates or which class plaintiffs might have bought shares derived from these certificates.[14] There was also no evidence to suggest that any plaintiff's ability to transfer these shares was hampered as a result of the forgery.
 
 
 98
 Sowell offered no other evidence which would suggest that the stock held by the plaintiffs during the class period was worthless. No IGE corporate records or tax documents were introduced to show that IGE itself lacked assets. No executive officers were called as witnesses.
 
 
 99
 In this long-pending complex case involving a substantial class, Sowell chose to rely primarily upon his own testimony and analysis to establish and tie together all of the damage aspects of the case. As a general rule, plaintiffs alleging securities fraud rely on expert testimony to establish both the fact of damage and the appropriate method of calculation. See, e.g., Behrens v. Wometco Enterprises, Inc., 118 F.R.D. 534, 542 (S.D.Fla.1988) (proof of damages in securities fraud case is always difficult and requires expert testimony), aff'd, 899 F.2d 21 (11th Cir.1990); and In re Warner Communications Securities Litigation, 618 F.Supp. 735, 744 (S.D.N.Y.1985) (expert testimony needed to fix amount and existence of actual damages), aff'd, 798 F.3d 35 (2d Cir.1986). Sowell argues that he, too, attempted to introduce expert testimony on the issue of damages, but was prevented from doing so by the district court's exclusion of these witnesses.
 
 
 100
 It is unclear from the record at what point Sowell first sought to introduce expert testimony on the issue of damages. At oral argument, however, the defendants made the uncontroverted assertion that Sowell did not seek to present expert testimony until after his own damage-related testimony was excluded.
 
 
 101
 In any event, it is clear that the trial court's ruling was not precipitous and did not constitute an abuse of discretion. Despite having been served with interrogatories directed to the identification of expert witnesses some five years prior to trial and again approximately four years before trial, Sowell failed to designate experts.
 
 
 102
 While Sowell did ultimately designate experts in an amended pre-trial statement filed some four days before the original trial date, he did not identify the experts' area of expertise, the substance of their opinions, and did not indicate that the experts' testimony would be directed to the issue of damages. Faced with the Defendants' Motion to Preclude Expert Testimony or, in the Alternative, to Compel Answers to Expert Witness Interrogatories, counsel for Sowell explained that he had declined to answer the interrogatories because counsel for the defendants refused to guarantee that he would not move to preclude the plaintiffs' experts at trial. The record includes a detailed exchange of correspondence between the parties' attorneys documenting the refusal of Sowell's counsel to make his experts available or to supply information regarding the substance of their testimony.
 
 
 103
 At oral argument, counsel for Sowell admitted that he had refused to supply information concerning his experts' testimony and had refused to make these experts available for deposition because he believed that he was entitled to advance assurances on the part of the defendants that no objection to the expert testimony would be raised. Counsel for Sowell did not seek a protective order or attempt to have the court address his discovery concerns.
 
 
 104
 Under the circumstances, we do not believe that the district court erred in precluding Sowell from introducing expert testimony with respect to damages. Counsel for Sowell failed to satisfy the obligations imposed upon him by the rules of discovery and cannot now be heard to complain that the district court erred in failing to admit expert testimony. While our review of this issue is made more difficult by the district court's failure to state the reason for excluding Sowell's experts, we are convinced that the exclusion would have been appropriate under Fed.R.Civ.P. 37 and that the district court's failure to allow the testimony does not rise to the level of reversible error.
 
 
 105
 In reaching this conclusion, we are mindful of our consistent position that "the importance of the excluded testimony is one of the factors to be considered in deciding whether the trial court abused its discretion in excluding a witness." Meyers v. Pennypack Woods Home Ownership Ass'n., 559 F.2d 894, 904 (3d Cir.1977), overruled on other grounds, Goodman v. Lukens Steel, 777 F.2d 113 (3d Cir.1985), aff'd 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). Given that Sowell's own damage testimony was inadequate, one could argue that expert testimony might have made some critical difference in the outcome of this case. We are unconvinced. Until the exclusion of his own damage-related testimony, Sowell never indicated that any expert would testify to the issue of damages. Even now, the record is totally devoid of any indication of what these experts' testimony might have been or how this testimony might have bolstered Sowell's case. We have been presented with no basis whatever for believing that the admission of expert testimony would have influenced the outcome of this case.
 
 
 106
 In sum, we believe that Sowell failed to establish proof of either prong of the required damage analysis. He failed to show with any certainty the purchase price of the IGE shares held by the plaintiff class. He also failed to introduce convincing evidence of the "true value" of IGE stock. His simple assertion that the stock was, at all times, worthless, although this may in fact be so, was not sufficient.
 
 V.
 
 107
 We conclude that the plaintiffs failed to adduce at trial that quantum of evidence on the issue of damages required to withstand a directed verdict on any of the theories of liability alleged. We find that the district court's grant of a directed verdict can be sustained with reference to damages alone and will, therefore, affirm the order of the district court.
 
 
 
 *
 Judge Sloviter became Chief Judge on February 1, 1991
 
 
 **
 Honorable H. Lee Sarokin of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 There is evidence in the record that during Moon's tenure as president he did acquire for IGE a fast food franchise known as "Granny's Basket", invested in oil and gas drilling in Tennessee, and, in 1979, took steps to purchase land for a gambling casino in Atlantic City, New Jersey
 
 
 [2]
 15 U.S.C. Sec. 78c(a)(38) defines a "market maker" as "any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis."
 
 
 [3]
 These certificates represented 1,801,080 shares of IGE stock
 
 
 [4]
 Bennett is alleged to have returned the forged certificates to IGE following the reverse split. IGE then issued new certificates representing post-split shares. These post-split shares were marketed to the public
 
 
 [5]
 Bennett sold between 20,000 and 30,000 shares of IGE stock in one week in April, 1979
 
 
 [6]
 The Commission made no finding as to Butcher & Singer's liability for failure to supervise under 15(b)(4)(E). On appeal, we affirmed the Commission. Butcher & Singer, Inc. v. S.E.C., 833 F.2d 303 (3d Cir.1987)
 
 
 [7]
 Although the district court's May 13, 1987 ruling left open the possibility of viable section 12(2) and Pennsylvania Securities Act claims based upon IGE stock purchases made between February and June, 1981, these claims apparently were abandoned prior to trial
 
 
 [8]
 While Sowell does not challenge the limitations ruling on the section 12 claims as such, he argues that the fact that class claims are time-barred for purposes of an action based on section 12(2) itself does not establish that they are also time-barred for RICO purposes. Sowell also argues that while sections 5 and 17 of the 1933 Act may not provide for a private right of action, these sections, too, are relevant in this case as RICO predicate acts
 
 
 [9]
 Resolution of this case on the issue of damages obviates the need for us to consider those allegations of error which are based upon other elements of Sowell's claims. We thus do not address Sowell's argument that those section 12(1) and 12(2) claims dismissed by the district court as time-barred or for want of privity and those Section 5 and Section 17 claims dismissed as lacking a private right of action have continued relevance as RICO predicate acts or as forming the basis for remaining 10b-5 claims
 Furthermore, while we have reservations concerning the district court's failure to grant full collateral estoppel effect to the findings made by the Commission in its January 13, 1987 opinion and order, which we affirmed, we do not address this failure substantively. We conclude that had Sowell been permitted to make unrestricted reference to relevant SEC findings of fact and conclusions of law, he still would have failed to meet his burden of proof with respect to damages.
 Similarly, we do not reach Sowell's allegation that the district court erred in barring discovery concerning Butcher and Singer's transfer of assets to Wheat First Securities.
 
 
 [10]
 The parties differ as to whether Sowell was obligated to produce at trial evidence relating to the class plaintiffs' individual damages or whether Sowell was permitted to prove class-wide aggregate damages subject to later apportionment. Because we conclude that Sowell's proof was inadequate under either theory, we need not reach this question
 
 
 [11]
 This case was filed on February 13, 1984. Trial did not commence until April 23, 1990
 
 
 [12]
 Sowell contends that at the time that litigation began, brokerage firm confirmation slips were no longer available
 
 
 [13]
 Sowell's argument that he possessed any expert knowledge necessary to examine the stock transfer registers is belied by the statement that he required help from others in order to arrive at the conclusions reached. We note, furthermore, that Sowell himself was never designated as an expert witness on the issue of damages
 
 
 [14]
 The record shows that no plaintiff actually purchased forged shares. The certificates which were forged were returned by Bennett to IGE after the reverse split occurred. IGE then issued to Bennett new, legitimate post-split shares. It was these post-split shares, representing less than one-fifth of the total post-split IGE shares, which were allegedly purchased by members of the class